**In re BJOLMES REALTY TRUST Debtor.**

**Bankruptcy No. 91–41451–JFQ.**

United States Bankruptcy Court, D. Massachusetts.

Dec. 17, 1991.

Carl Aframe, Worcester, Mass., for debtor.

Stephan M. Rodolakis, Peters & Erskine, Worcester, Mass., for Federal Deposit Ins. Corp.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

Bjolmes Realty Trust (the "Debtor") moves for court approval of the disclosure

statement for its chapter 11 plan. The Federal Deposit Insurance Corporation ("FDIC"), the holder of a first mortgage, opposes the motion on the ground that the plan improperly places the unsecured portion of its claim in a class separate from trade debt. On the assumption that it will vote that unsecured portion against the plan, the FDIC also objects to the Debtor's principals retaining their stock for an additional capital contribution. It contends that the plan cannot be confirmed because there is no such thing as a fresh contribution exception to the absolute priority rule. Both issues are central to many plans containing so-called "cram down" provisions under which the proponent seeks confirmation notwithstanding lack of acceptance of the plan by a class of claims. The issues are particularly important in a reorganization proposed by an owner or developer of real estate, so common in our troubled local economy, where the creditor body tends to be dominated by secured and unsecured claims of mortgage holders.

## I. FACTS

The Debtor is a trust with transferrable shares. Its trustee, Stanley R. Bjorkman, holds the property for the benefit of Donald Holmes ("Holmes") and Paul Bjorkman ("Bjorkman"), each of whom owns an equal number of shares. The Debtor's principal asset is a fifteen unit apartment building in Spencer, Massachusetts which is under the management of a real estate management company. Bjorkman and Holmes bought the property in 1985 for $410,000, later transferring it to the Debtor. In September of 1988, they refinanced their mortgage with Bank of New England (the "Bank"), obtaining a $380,000 first mortgage loan amortizable over twenty five years and due in two years. The mortgage note granted the Bank recourse against the Debtor. Bjorkman and Holmes also signed unconditional personal guarantees.

The Debtor remained current with the Bank until September 21, 1990, when the entire loan balance became due. New England was then in the throes of our present real estate recession, and the Debtor was unable to obtain refinancing from the Bank

or any other lender. The Bank, by then under the control of the FDIC, commenced foreclosure. The Debtor filed its chapter 11 petition on June 6, 1991, the day before the scheduled foreclosure sale.

The Debtor's plan places the unsecured trade debt of about $7,000 into one class and the unsecured portion of the FDIC's mortgage debt into another. The Debtor estimates that this unsecured portion amounts to about $160,000, based upon a $250,000 valuation of the building and a total debt balance of $410,000 including interest and costs. Although not committing itself to the $160,000 figure, the FDIC does not dispute that a large portion of its claim is unsecured under any standard of valuation for its mortgage interest.

Under the Debtor's plan, the court is to establish the value of the FDIC mortgage interest pursuant to 11 U.S.C. § 506(a). That secured claim, which is estimated at $250,000, is to be crammed down through equal payments of principal and interest over twenty five years at a rate of interest fixed by the court that will make the present value of the stream of payments equal the value of the secured claim. Both classes of unsecured debt are to be paid an immediate ten percent dividend totaling about $17,000. Rather than being discharged, the balance of the unsecured debt in both classes is to be secured by a new second mortgage and paid, without interest, at the time the building is sold or upon the refinancing or payment in full of the first mortgage. The plan proposes that Bjorkman and Holmes retain their stock interests in return for contributing the estimated $17,000 required for the initial dividend.

## II. APPROPRIATENESS OF ADJUDICATING ISSUES AT THE DISCLOSURE HEARING RATHER THAN AT CONFIRMATION

A preliminary question is raised concerning the appropriateness of the court passing upon substantive confirmation issues in the context of a hearing on the disclosure statement. The purpose of a

disclosure statement hearing is of course to determine whether the statement contains "adequate information" within the meaning of § 1125; this means information "of a kind, and in sufficient detail ... that would enable a hypothetical reasonable investor ... to make an informed judgment about the plan." The parties have nevertheless treated the hearing as having the additional purpose of adjudicating the propriety of the plan's proposed classification, pursuant to Rule 3013. The disclosure statement and plan were required to be filed by a prior order which also denied relief from the automatic stay under § 362(d)(2) on the ground that there was a reasonable possibility of plan confirmation within a reasonable period of time. The court at that time directed the parties to be prepared to argue these issues at the hearing on the disclosure statement. Thus the hearing has significant § 362 ramifications. It is permissible, moreover, for the court to pass upon confirmation issues where, as here, it is contended that the plan is so fatally and obviously flawed that confirmation is impossible. In *In re Eastern Maine Electric Co-op., Inc.*, 125 B.R. 329, 333 (Bankr. D.Me.1991); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr.S.D.Ohio 1990); *In re Monroe Well Service, Inc.*, 80 B.R. 324, 332 (Bankr.E.D.Pa.1987). For all the foregoing reasons, these issues are ripe for adjudication.

### III. SEPARATION OF UNSECURED DEBT INTO TWO CLASSES

The Debtor needs the acceptance of at least one impaired class of claims in order to cram down the secured and unsecured portion of the FDIC claim. 11 U.S.C. §§ 1129(b)(1), 1129(a)(8), § 1129(a)(10) (1991). In light of the size of the FDIC claim and its opposition to the plan, the need to obtain the acceptance by one class is the obvious reason that the Debtor seeks to separate trade claims into their own class. The Debtor is sanguine concerning acceptance of the plan by the trade but not by the FDIC.

The controlling authority on claim classification in this circuit is *In re Granada Wines, Inc.*, 748 F.2d 42 (1st Cir.1984). In *Granada Wines*, the debtor's chapter 11 plan placed into the same class its trade debt and its statutory liability for withdrawal from a multi-employer pension plan. Both claims were to be paid the same percentage dividend, but the dividend on the withdrawal claim was to be based upon fifty percent of the claim as the result of the fifty percent reduction allowed to an employer in liquidation. The court denied the reduction, ruling that the debtor was not in liquidation within the meaning of the statute permitting the fifty percent reduction.[1] Conceding that the claim would be reduced by fifty percent in a chapter 7 liquidation, the court ruled that this potential for reduction was not enough to distinguish the claim from other unsecured debt so as to support different treatment or classification. The court viewed the legal nature of all the claims to be the same. In construing § 1122,[2] the court relied upon case law under the prior Bankruptcy Act, stating:

> The general rule regarding classification is that all creditors of equal rank with claims against the same property shall be placed in the same class. *In re Los Angeles Land Investment, Ltd.*, 282 F.Supp. 448, 453 (1968), affirmed 447 F.2d 1366 (9th Cir.1971) quoting *In re Scherk*, 152 F.2d 747 (10th Cir.1945).

*Granada Wines*, 748 F.2d at 46.

The court was presumably influenced by the legislative history of § 1122 which

---

**1.** The debtor also argued that a dividend on the full withdrawal claim would violate the requirement of § 1129(a)(7)(A)(ii) that the trade creditors receive not less than what they would get under chapter 7. In chapter 7, clearly a liquidation, trade creditors would share with only fifty percent of the withdrawal claim. Regarding this as a matter of creditor choice rather than a fixed statutory standard, the court rejected the argument.

**2.** Section 1122 provides:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims of interests of such class.
> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

states that "[t]his section codifies current case law surrounding the classification of claims and equity securities." H.R.Rep. No. 595, 95th Cong., 1st Sess. 406 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 118 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5904, 6362. Confusingly, the prior Act had different rules under chapters X and XI. Chapter X, which governed the decisions cited in *Granada Wines,* required that "[a] creditor of equal rank with claims against the same property should be placed in the same class." Bankruptcy Act, § 197; 11 U.S.C. § 597 (repealed 1978). Chapter XI, on the other hand, permitted the plan to "include provisions for treatment of unsecured creditors on a parity with each other, or for the division of such debts into classes and the treatment thereof in different ways." Bankruptcy Act, § 357(1), '11 U.S.C. § 757(1) (repealed 1978).

The Debtor makes fond reference to decisions handed down in other jurisdictions permitting separate classification of claims based upon practical difference among the classes. *E.g., In re Jersey City Medical Center,* 817 F.2d 1055, 1060–61 (3rd Cir. 1987) (separate classification permitted for claims of physicians, medical malpractice victims, employee benefit plan participants and trade creditors); *In re U.S. Truck Co., Inc.,* 800 F.2d 581, 587 (6th Cir.1986) (claim from rejection of collective bargaining contract deemed unique due to union's noncreditor interest in the ongoing employment relationship). These courts reason that § 1122 prohibits placing dissimilar claims in the same class, but does not require that all similar claims be grouped in one class. They do not, however, deal with the contention that the statute's approval of a separate classification of small claims for administrative convenience, and its reference to that classification as an exception to the general rule, lends support to an interpretation that it otherwise requires all substantially similar claims to be placed in one class.

The Debtor nevertheless recognizes, as it must, that *Granada Wines* requires a distinction among classes based upon the legal nature of claims. The Debtor accordingly points to legal features of the FDIC unsecured claim which are not present in the trade debt—the necessity for an appraisal to establish the claim, the presence of personal guarantees and the benefit of a longer statute of limitations. But these are not enough. *Granada Wines* requires a difference in rank concerning rights against the debtor or its property.

■ The Debtor also refers to the FDIC's right to make an election under § 1111(b). This is the right to treat the entire amount of its allowed claim as a secured claim even though this amount exceeds the value of its mortgage interest. Should this election be made, the FDIC would not be entitled to share with trade creditors in other property now in the bankruptcy estate or brought into the estate through the avoidance powers. The FDIC's sole recourse would then be to look to the mortgaged property. Here is the type of dichotomy referred to in *Granada Wines*—a difference in rank with respect to property.

This distinction is not a technicality without significant practical aspects. The FDIC's mortgage interest greatly influences the manner in which it will vote its unsecured claim. This became obvious at the hearing when the FDIC indicated that it would vote its claim against the plan in order to strengthen its case for terminating the automatic stay now preventing it from foreclosing on the building. Holders of trade claims would receive nothing from the foreclosure and little if anything from liquidation of the Debtor's other assets, consisting primarily of equipment. Thus they would likely vote in favor of the plan. The potential held by the FDIC's unsecured claim for a difference in legal rank with the trade debt is therefore an indication of very real differences in these debts.[3]

---

3. The rules give a party holding such a bifurcated claim the right to make the election "at any time prior to the conclusion of the hearing on the disclosure statement or within such later time as the court may fix." F.R.Bankr.P. 3014. As shall be seen, the hearing on the disclosure statement will have to be reconvened. I will, in any event, fix the date of the confirmation hear-

This is no bad faith gerrymandering of the votes of the unsecured. In light of the heavy linkage in law and fact between the FDIC's secured and unsecured claims, its unsecured claim is that in name only. No policy concerns require that it dilute, here dominate, the vote of those truly acting in their interests as unsecured creditors.

## IV. THE RULE OF ABSOLUTE PRIORITY AND THE FAIR AND EQUITABLE PRINCIPLE

The necessary condition for a cram down—acceptance by an impaired class—will therefore have been met should the trade creditors accept the plan. Assuming that the FDIC votes its unsecured claim against the plan, the question remains whether the Debtor's principals may nevertheless retain their stock in consideration of an additional contribution of capital.

### A. *Existence of Fresh Capital Exception*

The parties have confined their arguments to the Debtor's proposition that the fresh capital contribution exception or corollary to the absolute priority rule [4] re-

mains in the law under the "fair and equitable" standard of § 1129(b) of the present Bankruptcy Code.[5] This is the issue expressly left open in *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 203–04 n. 3, 108 S.Ct. 963, 966–67 n. 3, 99 L.Ed.2d 169 (1988). The parties assume that the exception is a well defined principle which can be readily applied. As we shall see, that is not the case. But I must first determine whether the exception is now present in the law in any form.

The fresh contribution exception came into the prior Bankruptcy Act through *Case v. Los Angeles Lumber Products Co., Ltd.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), as part of the adoption of what the Court called the rule of "absolute priority." [6] The decision is somewhat of a tour de force by Justice Douglas in its expansive interpretation of the phrase "fair and equitable" appearing in § 77B of the old Act. The Court read the phrase as an incorporation of the rule fashioned by the courts in equity receivership reorganizations prohibiting retention of shares by stockholders contributing no new funds

---

ing as the election bar date in order to continue the status quo concerning classification. I treat the hearing which has been held as in part a hearing on claim classification under Rule 3013. The issue of classification should not remain in flux depending upon an expiration date for the election.

**4.** I will avoid the semantic battle over whether retention of stock for a contribution of fresh capital is an exception or a corollary to the absolute priority rule, and I will use the common parlance phrasing it in terms of an exception.

**5.** Section 1129(b) provides in pertinent part:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) [requiring acceptance by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or

interests that is impaired under, and has not accepted, the plan.

.  .  .  .  .

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

.  .  .  .  .

(B) With respect to a class of unsecured claims—
   (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
   (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

**6.** 308 U.S. at 117, 60 S.Ct. at 8 (1939). The phrase apparently first appeared in the legal literature in an article by Professors Bonbright and Bergman. *See* Bonbright and Bergman, *Two Rival Theories of Priority Rights of Secured Holders in a Corporate Reorganization*, 28 COL. L.REV. 127 (1928).

where creditors were not paid in full.[7] In response to the argument that participation by stockholders under the circumstances before it was justified because they provided continuity of management and financial standing and influence in the community, the Court conceded that there are circumstances under which stockholders may participate in the plan of reorganization of an insolvent debtor. It spoke of the "necessity, at times, of seeking [from the stockholders] new money essential to the success of the undertaking," stating: "Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made." 308 U.S. at 121, 60 S.Ct. at 10.[8] But it rejected the proffered intangibles of continuity of management and financial standing and influence in the community because such contributions could not be "translated into money's worth reasonably equivalent to the participation accorded the old stockholders." 308 U.S. at 122, 60 S.Ct. at 10.

Justice Douglas embellished a bit when he stated in *Los Angeles Lumber* that "[t]he words fair and equitable as used in § 77B(f) are words of art which prior to the advent of § 77B had acquired a fixed meaning through judicial interpretations in the field of equity receivership reorganizations." 308 U.S. at 115, 60 S.Ct. at 7.[9] But there can be no doubt that thereafter the phrase has become equivalent to the rule of absolute priority including the fresh capital exception, as demonstrated by this later summary by Justice Douglas: "[A] plan of reorganization would not be fair and equitable which ... admitted the stockholders to participation, unless the stockholders made a fresh contribution in money or money's worth, in return for 'a participation reasonably equivalent to their contribution'." *Marine Harbor Properties, Inc. v. Manufacturers Trust Co.*, 317 U.S. 78, 85–86, 63 S.Ct. 93, 97, 87 L.Ed. 64 (1942) quoting *Los Angeles Lumber*, 308 U.S. at 121, 60 S.Ct. at 10.

It was against this layer of case law that the "fair and equitable" standard of § 1129(b) was enacted into law. The committee reports and the statements on the floor neither approve nor disapprove of the exception; they mention it not at all. In declining to rule on the continued existence of the exception, the Court in *Ahlers* said: "[O]ur decision today should not be taken as any comment on the continuing validity of the *Los Angeles Lumber* exception—a question which has divided the lower courts since passage of the Code in 1978." [10] 485 U.S. 197, 203–04 n. 3, 108 S.Ct. 963, 966–67

---

**7.** 308 U.S. at 115–19, 60 S.Ct. at 7–8. The principal decisions relied upon were *Kansas City Terminal Ry. Co. v. Central Union Trust Co.*, 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926); *Northern Pacific Ry. Co. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); *Louisville Trust Co. v. Louisville N.A. & C. Ry. Co.*, 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130 (1899); *Railroad Co. v. Howard*, 7 Wall. 392, 19 L.Ed. 117 (1868). The common method of reorganization in those days, particularly for railroads, was the institution and consolidation of receivership and foreclosure proceedings, often initiated by creditors friendly to management. The property would then be sold to a new and reconstituted company having the same mortgage holders and the same stockholders. The stockholders paid a relatively small assessment for their new stock and unsecured creditors were squeezed out with little or no payment. *See e.g., Northern Pacific Ry. Co. v. Boyd*, 228 U.S. 482, 487–91, 33 S.Ct. 554, 556–57, 57 L.Ed. 931 (1913); Swain, *Reorganization of Corporations: Certain Developments in the Last Decade*, 27 COL.L.REV. 901 (1927); Ayer, *Rethinking Absolute Priority After Ahlers*, 87 MICH.L.REV. 963, 969–73 (1989).

**8.** Prior case law required no reasonable equivalence in the funds contributed by the old stockholders. The Court in *Kansas City Terminal Ry. Co. v. Central Union Trust Co.*, 271 U.S. 445, 455, 46 S.Ct. 549, 551–52, 70 L.Ed. 1028 (1926) put it this way: "Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them."

**9.** Professor Ayer says of this statement: "Strictly speaking, this is poppycock, and Justice Douglas knew it." Ayer, *Rethinking Absolute Priority After Ahlers*, 87 MICH.L.REV. 963, 975 (1989).

**10.** Professors Jordan and Warren observe that this statement "has had somewhat the same effect on bankruptcy lawyers that a pronouncement questioning the law of gravity would have on physicists." Robert J. Jordan and William D. Warren, *BANKRUPTCY* at 833 (2d ed. 1989).

n. 3. Although the decisions cited by the Court[11] hardly represented a division on the question, and two courts of appeal had by then applied the exception,[12] since *Ahlers* division has indeed appeared in the case law,[13] proof positive of the power emanating from even a blink of the Court.

■ I conclude that the fresh contribution exception remains in the law under § 1129(b). I do so because § 1129(b)(2)(B)(ii) is perfectly consistent with the exception. Its prohibition is only against receipt or retention of property "on account of" a stock interest. Receipt or retention of stock in consideration of a fresh capital contribution may be considered to be "on account of" the contribution and not the pre-existing stock interest. *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 588 (6th Cir.1986).

The decisions rejecting the exception read the statute as though it contains an unqualified prohibition against stockholders keeping their stock. It is of course arguable that stockholders permitted to receive or retain stock by making a contribution not available to others get their stock "on account of" their stock interest because no one else has had the opportunity to invest. But this means that the statute is at most ambiguous, requiring resort to traditional principles of construction.

Those principles resolve any doubt concerning its meaning.

In the first place, subsections (i) and (ii) do not purport to be a complete statement of the fair and equitable principle. The overarching command of § 1129(b)(1) is that the plan be "fair and equitable." Subparagraph (2) states that this command "includes" the specific requirements there set forth. The word "includes" is "not limiting." § 102(3). As we have seen, the fresh contribution exception was in the rule from the beginning as a limitation on the more expansive contribution rule prevailing before. In giving a one sentence summary of the fair and equitable principle, Justice Douglas in *Marine Harbor Properties* devoted more words to the fresh contribution exception than to the prohibition against continued stockholder participation. To try to separate the two is to try to unscramble the egg.

■ There is another reason why the fresh contribution exception is part of the statute. Even an opaque statute should be interpreted in light of case law existing at the time of its enactment. In *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 500–501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986), for example, the Court inter-

**11.** *In re Sawmill Hydraulics, Inc.*, 72 B.R. 454, 456 (Bankr.C.D.Ill.1987) (exception approved but evidence deficient on value of guaranty of bank debt offered by shareholders); *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 833 (Bankr.S.D.N.Y.1982) (no fresh contribution offered; exception not discussed at all).

**12.** *In re U.S. Truck Co.*, 800 F.2d 581 (6th Cir. 1986); *In re Potter Material Service, Inc.*, 781 F.2d 99 (7th Cir.1986).

**13.** *In re Greystone III Joint Venture*, 948 F.2d 134 (5th Cir.1991) (rejecting exception); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir.1990) (suggesting, without deciding, that exception no longer exists—no reference to meaning of "includes" as used in statute); *In re Anderson*, 913 F.2d 530, 530 (8th Cir.1990) (exception recognized but evidence too vague concerning proposed contribution by unnamed relatives in unspecified amounts); *In re Outlook/Century, Ltd.*, 127 B.R. 650 (Bankr. N.D.Cal.1991) (exception rejected because of statute's requirements, which were viewed as a

definition of fair and equitable principle—no reference to use of "includes"); *In re Lumber Exchange Limited Partnership*, 125 B.R. 1000 (Bankr.D.Minn.1991) (exception rejected in dicta as inconsistent with statute, but reorganization denied because of improper classification); *In re Winters*, 99 B.R. 658 (Bankr.W.D.Pa.1989) (exception denied because of statutory definition; "includes" permits only case law development of other consistent requirements); *In re 47th and Belleview Partners*, 95 B.R. 117 (Bankr. W.D.Mo.1988) (exception recognized but proposed guaranty of plan payments deemed insufficient contribution); *In re Yasparro*, 100 B.R. 91 (Bankr.M.D.Fla.1989) (exception recognized with amount of contribution not dependent upon amount of debt, but note of individual debtor held to be of insufficient value); *In re Henke*, 90 B.R. 451 (Bankr.D.Mont.1988) (exception recognized—use of "includes" stressed); *In re Rudy Debruycker Ranch, Inc.*, 84 B.R. 187 (Bankr.D.Mont.1988) (rejection of exception favored in dicta; proposed contribution deemed insufficient because not equal to amount of debt).

preted § 554 governing abandonment to include the "established corollary" in the case law that a trustee could not exercise his abandonment powers in violation of law. Section 554, unlike § 1129(b), contains no ambiguous language and no phrase having a settled meaning, nor does it use the word "includes" as a clear indication that its requirements are nonlimiting.

In a recent decision denying the presence of the fresh contribution exception under § 1129(b)(2)(B), the Fifth Circuit denies the force of the statutory phrase "on account of" and tortures the definition of "includes," stating: "[The word "includes"] sets forth a minimum standard for a fair and equitable plan that may be confirmed over creditor objections.... The 'new value exception,' by contrast, dilutes the minimum requirement." *In re Greystone III Joint Venture,* 948 F.2d 134, at 143 (5th Cir.1991). Despite the instruction of § 102(3) that provisions which follow the word "includes" are "not limiting," the court limits any additional concepts. And it does so by saying that the prohibition against retention of any property by the shareholders on account of their stock interest is only a minimum requirement, as though they could receive less than nothing.[14]

The fresh contribution exception no more "dilutes" the requirement of subparagraph (ii) of the statute than does case law concerning the requirement of subparagraph (i). That is the subparagraph which provides that the fair and equitable principle is satisfied if creditors receive "property of a value" equal to the amount of their claims. Where the debtor is valued as solvent so

that creditors have to be paid in full, it is nevertheless permissible for stock to be issued to both creditors and stockholders, so long as the securities issued to creditors have a value equal to the amount of their claims after taking into account the amount needed to compensate them for the loss of their former priority rights. *Consolidated Rock Products v. DuBois,* 312 U.S. 510, 527–29, 61 S.Ct. 675, 685–86, 85 L.Ed. 982 (1941). This joint participation in equity is permissible even though the shareholders make no new and essential contribution.

These and other ramifications of the fair and equitable principle, including the requirement that senior classes receive no more than full compensation, have been expounded upon in the literature.[15] To reduce the entire principle to statutory form was a daunting task for Congress to undertake. Its use of a shorthand reference to the fair and equitable principle is understandable.

■ One court has stated that the fresh contribution exception was "100% dicta" in the decisions of the Supreme Court under the old Act. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1360 (7th Cir.1990). This is not so. In *Marine Harbor Properties, Inc. v. Manufacturers Trust Co.,* 317 U.S. 78, 63 S.Ct. 93, 87 L.Ed. 64 (1942), the Court based its decision on the exception. The Court approved dismissal of the chapter X proceeding to allow the continuation of a foreclosure. It did so in part because there was no indication that the stockholders wanted to make the fresh capital contribu-

14. In the case cited by the court for its interpretation of the statute as imposing minimum requirements, *Matter of D & F Construction, Inc.,* 865 F.2d 673, 675 (5th Cir.1989), the court there rejected an attempted secured party cram down which called for negative amortization. It did so because it regarded this type of payment to be unreasonable and therefore not fair and equitable. This holding disregards Justice Douglas's "words of art." It is also unnecessary. If negative amortization prevented the stream of payments from having a present value equal to the value of the security interest, the court should have held that the payments failed the present value requirement of § 1129(b)(2)(A).

15. *E.g.,* Klee, *Cram Down II,* 64 AM.BANKR.L.J. 229 (1990); Blum & Kaplan, *The Absolute Priority Doctrine in Corporate Reorganization,* 41 U.CHI.L.REV. 651 (1974); Billyou, *Priority Rights of Security Holders in Bankruptcy Reorganizations: New Directions,* 67 HARV.L.REV. 553 (1954); Blum, *The "New Directions" of Priority Rights in Bankruptcy Reorganizations,* 67 HARV. L.REV. 1367 (1954); Billyou, *"New Directors": A Further Comment,* 67 HARV.L.REV. 1379 (1954).

tion permissible under chapter X. 317 U.S. at 85–6, 63 S.Ct. at 97. Even if considered dicta, however, repeated statements of the Supreme Court concerning a statutory phrase can hardly be ignored in searching for the phrase's meaning.

Some of the decisions rejecting the fresh contribution exception claim support from the rejection by Congress of the Bankruptcy Commission's proposal to modify the absolute priority rule. *See In re Greystone III Joint Venture*, 948 F.2d 134; *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1361–62 (7th Cir.1990). This is a curious use of legislative history. The Commission proposed that the fresh contribution exception be modified to recognize a contribution of the types of intangibles rejected in *Los Angeles Lumber*. *Report of the Commissioner on the Bankruptcy Laws of the United States*, H.R.Doc. No. 137, 93d Cong., 1st Sess., Part I, §§ 7–303(7), 7–310, Part II, 258 (1973). Rejection of a watered-down version of the exception is no indication of an intent to reject the exception itself.

### B. *Application of Fresh Contribution Exception*

#### 1. *In General*

The facts of this case are fairly simple, but application of the fresh contribution exception to them is not. The fresh contribution exception has never developed clear guidelines for its application. The exception permits stockholder participation in light of the "necessity, at times, of seeking new money essential to the success of the undertaking from the old stockholders." *Los Angeles Lumber*, 308 U.S. at 121, 60 S.Ct. at 10. The stock retained or received for the contribution has to be "reasonably equivalent to the contribution." *Id.* Apparently, no reported decision under the old Act grappled with applying these standards.

Questions occur. How does one determine that it is necessary to seek capital only from stockholders without first exploring other sources, including creditors? Is the required equivalency between the contribution and the retained stock interest to be determined through a valuation by the court (presumably reflecting debt discharge) or through actual market forces? If through valuation by the court, under what standard of valuation? If through market forces, would not bidding be required, and, if so, should the bidding be open to third parties as well as creditors? If some form of bidding is permitted, should the court also value the stock as a check on the winning bid? What capital is essential to the success of the enterprise? Should there be a standard for determining a required minimum?

Decisions under the present Code adopting the exception seem to recognize the need to fashion workable standards, but to date they have sought to answer only a few of these questions. Some suggest that the debtor must have no alternative source of capital. *E.g., In re Potter Material Service, Inc.*, 781 F.2d 99, 102 (7th Cir. 1986). Others say that the contribution must be "substantial." *E.g., In re U.S. Truck Co., Inc.*, 800 F.2d 581, 588 (6th Cir.1986); *Potter Materials*, 781 F.2d at 101. The decisions are particularly troubling in their handling of valuation of the retained stock interest. They show no awareness that the stock's value is enhanced by the discharge of debt under the plan. And they do nothing to allay the suspicion that a court, intent on promoting reorganization, will gear the valuation to equal the contribution. *See, e.g., In re U.S. Truck Co., Inc.*, 800 F.2d at 588; *In re Potter Material Services, Inc.*, 781 F.2d at 103–04.

The problem of valuation and the potential for market forces to play a role therefore remain largely unexplored in the case law. One writer favoring the exception suggests that at the very least creditors be given an opportunity to match or exceed the amount available from stockholders. Klee, *Cram Down II*, 64 Am.Bankr.L.J. 229, 244 (1990).

#### 2. *Valuation Standard*

Valuation under the fair and equitable principle is as problematic under the present Code as it was under the prior Act.

The Code's legislative history is highly critical of the valuation process under old chapter X, which required a valuation of the business for the confirmation of all plans whether or not they contained cram down features. The House Report states:

> [A]pplication of that rule [the absolute priority rule] requires a full going concern method of valuation of the business. Though valuation is theoretically a precise method of determining the creditors' and stockholders' rights in a business, more often the uncertainty of predicting the future, required in any valuation, is a method of judging a result that will support the plan that has been proposed. As Peter Coogan has aptly noted, such a valuation is usually "a guess compounded by an estimate."
>
> H.R.Rep. No. 595, 95th Cong., 1st Sess. 222 (1977), U.S.Code Cong. & Admin.News 1978, p. 6181.

The House Report further states that the cram down provision of the bill then pending, which was similar to § 1129(b) as enacted, required a valuation of the debtor "as the absolute priority rule does under current law." *Id.* at 224, U.S.Code Cong. & Admin.News 1978, p. 6184. We have therefore inherited from prior law valuation principles which apply only in cram down situations.

There was good reason for Congress to avoid these valuation principles in cases not involving a cram down. The process is governed by a complex standard of valuation which has come to be known as "reorganization value." [16] It is subtly but substantially different from traditional going concern value. Although also established through the multiplication of an earnings figure by a capitalization rate, reorganization valuation emphasizes projected earnings of the debtor after it emerges from the ashes following reorganization. Past earnings are taken into account, along with other factors, but only for the purpose of projecting future earnings. This is on the theory that the debtor's value, and hence those seeking a share in it, should not suffer from management's errors of the past.[17] A fact finder is subject to reversal if he places too much emphasis on the debtor's track record without taking sufficient account of its future after the reorganization.[18] One writer furnishes this definition: "Reorganization value is what some appraisers believe the current market value of the distressed company ought to be if the present were like the future they foresee." [19] This is quite different from how a price is arrived at in the actual sale of a business, where a seller's prediction of future improvements seldom increases the price. It is also different from a § 506(a) valuation of a security interest such as the mortgage interest of the FDIC. What is being valued there, in the wording of § 506(a), is not the collateral but the "creditor's interest in the estate's interest in [the]

**16.** Blum, *The Law and Language of Corporate Reorganization,* 17 U.CHI.L.REV. 565, 570 (1950).

**17.** The classic description of this valuation process is contained in *Consolidated Rock Products Co., v. DuBois,* 312 U.S. 510, 526, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941):

> The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculation or disaster, and if the allocation of securities among the various claimants is to be fair and equitable.... Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition

of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance.

*See also* Gardner, *The SEC and Valuation Under Chapter X,* 91 U.PA.L.REV. 440 (1943); Blum, *Corporate Reorganizations Based on Cash Flow Evaluations,* 38 U.CHI.L.REV. 173 (1970).

**18.** *E.g., Protective Committee for Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 441–54, 88 S.Ct. 1157, 1172–78, 20 L.Ed.2d 1 (1967) (trial judge's finding of insolvency reversed, despite declining earnings, primarily because of debtor's potential for further volume increases only obtainable through acquisition of new equipment).

**19.** Blum, *The Law and Language of Corporate Reorganization,* 17 U.CHI.L.REV. 565, 578 (1950).

property," which typically means what the property will bring at foreclosure. *In re Robbins*, 119 B.R. 1 (Bankr.D.Mass.1990); *See* Queenan, *Standards for Valuation of Security Interests in Chapter 11*, 92 Comm.L.J. 18, 33 (1987).

Reorganization value is not an appropriate standard to use in applying the exception. Its expansive concept of value was devised in order to facilitate a finding of solvency and hence permit participation by stockholders making no fresh contribution. *See* Blum, *The Law and Language of Corporate Reorganization*, 17 U.Chi.L.Rev. 565 (1950). Its use to measure the value of retained stock interests where shareholders are making a contribution would tend to obstruct rather than facilitate their continued participation. Interestingly, Justice Douglas's statements of the fresh contribution exception avoid all use of valuation terms, suggesting he perhaps had doubts that reorganization value is an appropriate measure for this purpose.

### 3. *Allowance for Market Forces*

Reorganization valuation cannot be avoided where the stockholders propose no fresh contribution and creditors wish to exclude them from participation on the ground that the debtor is insolvent.[20] In that situation, there is no transaction in shares, so that the court has no alternative but to conduct its own valuation.[21]

In applying the fresh contribution exception, however, there *is* a transaction in shares. Whether or not new shares are issued, the justification for the exception is that the shareholders are in effect buying new shares for a new contribution, just as third parties could. *E.g., In Marston Enterprises, Inc.*, 13 B.R. 514, 518 (Bankr. E.D.N.Y.1981). That transaction should be

measured against market forces, making it unnecessary for the court to become embroiled in the vagaries of reorganization value or any standard of valuation.

The lack of other sources of capital is also an important part of the rationale for permitting stockholder participation. As observed in *Los Angeles Lumber*, stockholders are allowed to retain their stock for the new contribution because they "may" be "the only or most feasible source of the new capital." 308 U.S. at 121, n. 15, 60 S.Ct. at 10, n. 1. That presumption should be tested in the market.

■ Where, as here, the shares are not publicly traded, the only way to measure the proposed contribution against actual market value is to offer the stock for sale. In circumstances where creditors are not interested in bidding, or they lack the funds to do so, the business would presumably have to be placed on the market in order to encourage third party buyers. That is not the situation here. As the holder of a first mortgage which it seeks to foreclose, and as a party with substantial resources, the FDIC is a likely buyer. In view of the small amount of debt held by others, the FDIC would be the principal beneficiary of the winning bid, giving it an advantage in the contest. Indeed, its posture favoring foreclosure may well deter any other buyer. I will therefore require, as a condition to plan confirmation, that an auction be held among the Debtor's shareholders, the FDIC and any other creditor interested in purchasing. The property to be sold will consist of a 100% equity interest in the Debtor to be represented by the issuance of new shares in replacement of the present shares.[22]

---

**20.** *See, e.g., Anderson, supra* note 18.

**21.** Current market value is always irrelevant in determining reorganization value, even though the shares are publicly traded, because it is the future business that is actually being valued. Blum, *The Law and Language of Corporate Reorganization*, 17 U.CHI.L.REV. 565 (1950).

**22.** If the FDIC were bidding at a sale of the real estate alone, it could offset the entire amount of its claim, secured and unsecured, against the

purchase price. 11 U.S.C. § 363(k) (1991). That cannot be done with respect to its secured claim in this stock sale; the secured claim is to be separately dealt with under the plan. Nor can it be done as to the unsecured FDIC claim. This is an issuance of stock; setoff would deprive other unsecured creditors of their share of the proceeds. Nevertheless, the FDIC's status as the prime beneficiary of the winning bid accomplishes the same essential result while also recognizing the interests of shareholders.

In order that the reorganization may be completed, I will require that the winning bidder cause the Debtor to consummate the Chapter 11 plan. The present plan will have to be revised in two respects. The proposed ten percent dividend must be increased to the extent that the winning bid exceeds the $17,000 offered by the shareholders. And there is no need to have a secured note for the balance of the debt. The second mortgage note under the present plan was to be payable upon the sale of the building or upon the refinancing or payment in full of the first mortgage. Its purpose was presumably to give creditors a share in any future increase in the value of the real estate, in the spirit of the rule of absolute priority. Granting creditors the right to bid on the stock is a more effective way of enforcing that spirit.

## V. POLICY CONSIDERATIONS

■ The Bankruptcy Code should be interpreted in light of the policies underlying reorganization. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203–04, 103 S.Ct. 2309, 2312–13, 76 L.Ed.2d 515 (1983). "[R]eorganization, in its fundamental aspects, involves the thankless task of determining who should share the losses incurred by an unsuccessful business and how the value of the estate should be apportioned among creditors and stockholders."[23] Like all areas of the law, chapter 11 reorganization requires a balancing of the economic and social interests of those affected. There are three constituent groups in a reorganization—creditors, owners and those dependent upon the debtor such as employees, suppliers and customers. *See* Nimmer, *Negotiated Bankruptcy Reorganization Plans*, 36 Emory L.J. 1009 (1987). Although creditors have a compelling interest as the prime beneficiaries of the bankruptcy estate, all these interests must be considered. The reorganization process is much more than a collective proceeding for the enforcement of rights held by creditors under state law.[24]

The bidding procedure required here maintains such a balance. If the fresh contribution exception were applied through valuation by the court, the absence of market forces would give shareholders undue leverage. This is the prime basis of the decisions which have rejected the exception.[25] An auction avoids that leverage. True, because of the size of its claim, the FDIC has a great advantage in the bidding as the prime beneficiary of the bid. But that is merely a reflection of its overwhelming financial interest. Due to the relatively simple nature of the Debtor's business and the fact that it is managed by a third party, the shareholders here lack the leverage that shareholders might otherwise have. That too is a reflection of their interest as mere investors. In a business involving management skills as well as relationships enjoyed by management with suppliers and customers, shareholders active in management would have an advantage of their own in the bidding because the business would be worth less without them. That economic power is a reflection of their interests as entrepreneurs, which has social as well as economic significance. It is not present here, and as a result the major creditor will likely assume ownership. That is as it should be.

## VI. ABSENCE OF PROPERTY RETAINED "ON ACCOUNT OF" STOCK INTEREST

The bidding rights given the Debtor's shareholders may arguably constitute "property" within the meaning of § 1129(b)(2)(B)(ii). But because every unsecured creditor is granted an identical right, this is clearly not the receipt or retention of property "on account of" a stock interest within the meaning of the statute.

**23.** S.REP.NO. 989, 95th CONG., 2d SESS. 10, reprinted in 1978 U.S.CODE CONG. & ADMIN.NEWS 5796.

**24.** There is of course a debate on this issue. *See, e.g.,* Warren, *Bankruptcy Policy*, 54 CHI. L.REV. 775 (1987); Baird, *Loss Distribution, Fo-*

*rum Shopping, and Bankruptcy: A Reply to Warren*, 54 CHI.L.REV. 815 (1987).

**25.** *See, e.g., In re Greystone III Joint Venture*, 948 F.2d 134, at 142; *Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351, 1361 (7th Cir.1990).

In the final analysis, therefore, the requirement of subparagraph (ii) is satisfied without the need to resort to the fresh contribution exception. The impetus for the auction, however, comes from the exception.

## VII. CONCLUSION

The plan and disclosure statement will have to be amended to reflect the foregoing. The confirmation hearing will include an auction, attended by any interested bidders among the Debtor's creditors and shareholders, for the original issuance of a one hundred percent stock interest in the Debtor. The stock issue will be subject to confirmation by the court, which will depend solely upon a determination that the price is the result of competitive bidding.

A separate order has issued.