**In re ROPT LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 92–16023–CJK.**

United States Bankruptcy Court, D. Massachusetts.

March 8, 1993.

Victor Milione, Boston, MA, for Debtor.

Daniel Carragher, Boston, MA, for Sun Life.

Stewart Grossman, Boston, MA, for Committee of Unsecured Creditors.

MEMORANDUM OF DECISION AND ORDER ON THE OBJECTION OF SUN LIFE ASSURANCE COMPANY OF CANADA TO CONFIRMATION OF THE DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION

CAROL J. KENNER, Bankruptcy Judge.

This case is before the Court on the Objection of Sun Life Assurance Company

of Canada (U.S.) ("Sun Life") to Confirmation of the Debtor's First Amended Plan of Reorganization ("the plan"). Sun Life raises six objections to confirmation. For the reasons set forth below, the Court overrules five of these and, in sustaining the sixth, conditions confirmation of the plan on the Debtor's circulation of a notice of sale of the equity interest in the Debtor and, if counteroffers are submitted, an auction of the equity interest.

### a. Treatment of Secured Claim Under Plan

The Debtor's principal asset is real property, two office buildings located at 822–826 Boylston Street, Brookline, Massachusetts ("the property"), having a total value of $4,200,000. According to the Debtor's Modified First Amended Disclosure Statement, Sun Life has a claim against the Debtor in the amount of $4,301,473. The claim is secured by a mortgage on the property, but the mortgage is subject to a senior tax lien. Therefore, according to the Disclosure Statement, Sun Life has a secured claim of $3,965,000 and an unsecured deficiency claim of $336,473. 11 U.S.C. § 506(a).

Under the plan, Sun Life would retain its mortgage and receive payment in full of its secured claim over five years. During the first two years of the plan, the Debtor would pay interest monthly on the claim at 8.0 percent per annum. During the third through fifth years, the Debtor would continue paying interest and would also make monthly payments of principal according to a twenty year amortization schedule. All unpaid principal and accrued interest would be due and payable in a final balloon payment on the fifth anniversary of the effective date of the plan. According to projections prepared by the Debtor, the final payment would be in the amount of $3,692,-135; therefore, the thirty-six monthly payments of principal required in years three through five would total $272,865 [$3,965,-000 − 3,692,135 = $272,865], approximately seven percent of the amount of the claim. The Debtor contemplates that the final payment will be funded either by refinancing the property or by selling it. Un-

der the plan, Sun Life's secured claim is deemed impaired; it is the only claim in its class; and the class, Sun Life, has voted not to accept the plan.

Sun Life objects to this treatment of its secured claim. Sun Life alleges that the present value of deferred payments under the plan is over $300,000 less than the amount of its claim because the proposed rate of interest is not a market rate. Sun Life argues that in view of market conditions, the low amortization, and the risk of depreciation, the market rate is 10⅜ percent, and the plan must pay interest at this rate to be fair and equitable. Moreover, the plan unfairly shifts all risk of decline in the value of the property to Sun Life by providing too little amortization of the debt. Therefore, the plan does not satisfy the Bankruptcy Code's requirement that the plan be fair and equitable, 11 U.S.C. § 1129(b)(1).

A plan must be "fair and equitable" with respect to each impaired class that has not accepted the plan. 11 U.S.C. § 1129(b)(1). For a class of secured claims, the condition that a plan be fair and equitable includes the requirement that

each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

11 U.S.C. § 1129(b)(2)(A)(i)(II). Therefore, when a plan proposes to pay a secured claim over time, the payments must have a present value equal to or greater than the amount of the secured claim.

Courts differ as to how to calculate the interest rate that would provide the required value. Most use some variant of the market rate or "coerced loan" approach. Under this approach, the appropriate rate of interest on deferred payments to secured creditors is "the current market rate of interest used for similar loans in the region." *In re Hardzog*, 901 F.2d 858, 860 (10th Cir.1990); *In re Busconi*, 147 B.R. 54, 55 (Bankr.D.Mass.1992) (choosing mar-

ket rate approach as more fair to secured claimants and consistent with the weight of authority). Thus courts look to the market rate for loans with similar duration, security, and risk of default. The advantage of this method is that the market rate is relatively easy to ascertain; its spares the Court and the parties the complex task of balancing a host of factors to arrive at an appropriate rate, a task which the market itself has already performed.

■ The disadvantage is that some factors that lenders consider, and that therefore affect the market rate, are not appropriate to the § 1129(b)(2)(A)(i)(II) determination, factors such as the lender's overhead and, most importantly, profit. For this reason, some courts have opted for a two-factor, "riskless rate" approach. This approach starts with a riskless rate—usually the current rate of interest being paid on government treasury bonds of comparable duration—to assure that the deferred stream of payments has a present value equal to the value of the secured claim, then increases that rate to account for the risk of nonpayment. *United States of America v. Doud*, 869 F.2d 1144, 1145 (8th Cir.1989); *In re Computer Optics, Inc.*, 126 B.R. 664 (Bankr.D.N.H.1991). This approach has the virtue of adhering to the Code's purpose of affording secured creditor's only the value of their interest in the collateral, without additional profit, but it leaves the courts with the difficult task of determining the appropriate rate of compensation for risk.

Those who follow the riskless rate approach are correct in holding that a secured creditor is not entitled to a premium in the form of profit on its secured claims. The secured creditor is entitled only to the value of its interest in the collateral; therefore, the interest rate should compensate the secured creditor only for the two factors with which the riskless rate is concerned: the time-value of money, and risk.[1]

■ In essence, Sun Life is arguing not that the plan does not compensate Sun Life for the time value of its interest in the property, but that it provides inadequate compensation for risk.[2] Sun Life argues that the risk is high because the value of the collateral is equal to the amount of the claim, and the plan provides for only seven percent amortization, with the balance to be paid either by refunding the property or by selling it. Therefore, if the property depreciates more than seven percent in five years, Sun Life will not receive the full value of its claim.

The Court disagrees. The plan, as amended at the hearing on confirmation, provides more amortization and security for Sun Life's secured claim than is apparent from the treatment of the secured claim itself. First, the plan provides for Sun Life to retain its mortgage on the property and for the Debtor to amortize seven percent of the amount of the secured debt out of revenues.[3] Second, at the hearing on this motion, the Debtor offered to amend the plan by increasing the interest rate on Sun Life's secured claim to nine percent, if the Court deemed that necessary for confirmation, as it does. This additional one percent per year, though not a payment of principal, is equivalent to an additional amortization over the life of the plan of five percent of the amount of the

---

1. Nonetheless, the adjusted riskless rate approach is unreasonably difficult to apply where risk is significant. Without recourse to market rates, compensation for risk is difficult to quantify, plan negotiation becomes difficult and almost invariably leads to litigation, and adjudication of the appropriate rate becomes more speculative than principled.

   A better approach would be to start with the market rate and to adjust it downward to eliminate the portions thereof that constitute profit and overhead, an adjusted market approach. This approach arrives at the same result as does the riskless rate approach, but by a different route. It has at least two advantages. First, by

starting with the market rate, an external point of reference, it simplifies both negotiation and adjudication. And second, it effectively places the burden of proof on the debtor, on whom it belongs.

2. The parties agree that the market rate of interest for a well-secured loan is between 8.0 and 8.125 percent.

3. Not insignificantly, the plan also permits Sun Life to foreclose if at any time the Debtor defaults on its obligations to Sun Life during the five-year term of the plan.

secured claim. And third, the plan provides for the Debtor to pay the senior tax lien on the property out of revenues. By eliminating this lien, the Debtor would effectively be increasing the value of Sun Life's collateral by an amount equal to the amount of the lien, $327,605.00, which is eight percent of the amount of the secured claim. In sum, these three factors provide amortization and additional security totalling twenty percent of the amount of the secured claim.

The evidence shows that the market rate for five-year commercial loans is between 7.5 and 8.5 percent. (If the loan-to-value ratio were 100 percent, the rate would be higher, but lenders would not insist on a ratio as low as 65 percent, as Sun Life contends.) I find that with the package of security, amortization, and lien payoffs explained in the previous paragraph, lenders would be willing to lend the amount of Sun Life's secured claim for five years at nine percent. Moreover, the nine percent rate, being a market rate, includes a profit component to which a secured claimant is not entitled under a Chapter 11 plan and which, in this instance, provides Sun Life with extra security and compensation for risk.[4] Therefore, the plan does not violate § 1129(b)(2)(A)(i)(II) and is fair and equitable with respect to Sun Life's secured claim.

### b. Feasibility

■ Sun Life next objects to confirmation on the basis that the plan is not feasible. In order for a plan to be confirmed, the Debtor must prove that it is feasible: that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor. 11 U.S.C. § 1129(a)(11). The plan requires the Debtor to make periodic payments during the five years after confirmation and to make two balloon payments on the fifth anniversary of the effective date of confirmation: $3,692,135 to Sun Life and $214,000 to unsecured creditors. The Debtor expects to fund the periodic payments

out of operating revenues and to fund the balloon payments either by refinancing the property or by selling it. Sun Life argues that the plan is not feasible in two basic respects: the cash flow from the property will not support the periodic payments required during the five-year plan period; and the property will not appreciate enough to enable the Debtor to borrow the funds necessary to make the balloon payments to Sun Life and the unsecured creditors.

■ The Court finds no support for the contention that the balloon payments will not be feasible. The expected balloon payments total $3,906,135, which is approximately $300,000 less than the current value of the property. It is unlikely that lenders will want to finance these payments if the property remains at its current value. They would insist on a higher loan-to-value ratio; therefore, the property will have to appreciate somewhat if the Debtor is to fund the balloon payments by refinancing. However, if the property's value remains the same or only depreciates one or two percent during these five years, the Debtor will be able to finance the payments by selling the property. And, if the Debtor is able to sell the property without a broker, the balloon payments will be feasible even with depreciation of four or five percent. Of course, there is some risk that the property will be unable to fund fully the required payments, but the feasibility test is one of probability and likelihood, not possibility. I conclude that the balloon payments are feasible: they are not likely to require the further financial reorganization of the Debtor; and although they will likely require the liquidation of the Debtor, that is no bar to confirmation when the plan calls for such liquidation. 11 U.S.C. § 1129(a)(11).

I reach the same result with respect to the periodic payments required by the plan. The plan requires periodic payments to three classes of creditors. First, the plan

---

**4.** The Court is not ruling that Sun Life is entitled to profit on its secured claim. It is not entitled to profit. Rather, Sun Life is entitled to security and compensation for risk, of which, in this instance, the profit element in the market rate provides a necessary measure.

(as amended) requires monthly payments during the first two years to Sun Life (on its secured claim) of $29,737, consisting of interest at nine percent; and, in the third through fifth years, monthly payments of $36,469, consisting of principal (according to a twenty year amortization schedule) and interest at nine percent. Second, the plan requires quarterly installments on the unsecured claims of totalling $4,924 per quarter in the first year, decreasing annually to $4,556 per quarter in the fifth year, which would amortize fifty percent of the principal amount of the unsecured claims over five years, with interest at five percent per annum on the unpaid principal balance.[5] And third, the plan calls for monthly payments of $7,776 on the tax claim of the Town of Brookline, which would amortize that claim with interest in five years.

The Debtor's projections show operating income sufficient to make these payments as they come due, with a reasonable reserve. I find that these projections are reasonable and that the plan is likely to succeed.

### c. Good Faith

■ Sun Life argues that the Debtor has not proposed the plan in good faith because an affiliate of the Debtor, a realty trust that was not eligible for bankruptcy protection, transferred the property to the Debtor after the Debtor filed its petition under Chapter 11 solely to bring the property within the jurisdiction of the Bankruptcy Court. The Debtor and the affiliate are controlled by a common principal, Mr. Stuart Roffman. The Court finds that he arranged the transfer as alleged and for just the purpose alleged. However, the Court does not deem the transfer, or the Debtor's acceptance of it, to be an act of bad faith. Nominee trusts cannot be debtors under the Bankruptcy Code, but nothing prevents a real estate partnership or

corporation from filing a bankruptcy petition, even where the function of the partnership or corporation is to limit investors' liability. I see no reason to expand the rule excluding nominee trusts from bankruptcy into a rule defining bad faith. Nothing intrinsic about the property at issue here would exclude it from bankruptcy protection. The mere fact, standing alone, that it was once held by a nominee trust should make no difference. Therefore, this objection fails to state cause to deny confirmation under 11 U.S.C. § 1129(a)(3).

### d. Impairment of Tax Claim

■ Sun Life also argues that the Debtor has wrongly classified the Town of Brookline's claim as impaired. Sun Life contends that because the plan proposes to pay the claim in full over five years at above-market interest rates,[6] the claim is not impaired. And because the class containing the Town's claim is the only one to have accepted the plan,[7] the requirement of 11 U.S.C. § 1129(a)(10) has not been satisfied. Section 1129(a)(10) provides that if a class of claims is impaired under the plan, the Court may confirm the plan only if at least one impaired class has accepted the plan. The Court rules that although the Town's claim receives very favorable treatment, it is impaired because it alters the Town's legal right to foreclose immediately on its fully-secured tax lien. 11 U.S.C. § 1124(a)(1) (a class of claims is impaired unless, with respect to each claim in the class, the plan leaves unaltered the legal rights to which the claim entitles its holder).

### e. Unfair Discrimination

■ Sun Life also objects to confirmation on the basis that the plan, by providing better treatment for the Town of Brookline's secured claim than for Sun Life's secured claim, discriminates against Sun

---

5. Payments of principal to unsecured creditors are subject to the availability of "excess operating income;" principal not paid during the five years after confirmation will be added to the final, balloon payment to unsecureds.

6. Part of Brookline's claim will be paid with interest at fourteen percent and the remainder with interest at sixteen percent.

7. The Town's claim is the only claim in the class.

Life for the sole purpose of obtaining the Town's acceptance of the plan to satisfy the requirement of 11 U.S.C. § 1129(a)(10). Sun Life raised this objection for the first time in its memorandum filed after the evidentiary hearing on confirmation of the plan. The issue was thus raised late; objections were due long before the evidentiary hearing. And the timing of the objection deprived the Debtor of a meaningful opportunity to respond. Therefore, this objection is overruled.

### f. Violation of Absolute Priority Rule

Sun Life also objects to confirmation on the basis that the plan violates 11 U.S.C. § 1129(b)(2)(B)(ii), the absolute priority rule. This rule states that for a plan to be fair and equitable with respect to a class of unsecured creditors whose members are not receiving value, as of the effective date of the plan, equal to the allowed amount of their claims, holders of junior interests may not receive or retain any property under the plan. 11 U.S.C. § 1129(b)(2)(B). Sun Life contends that the plan violates this rule because, although the unsecured creditors would not receive value equal to the allowed amounts of their claims, partners holding allowed partnership interests in the Debtor would retain their interests. The Debtor has two partners. Its sole general partner is ROPT G.P., Inc., a corporation of which Stuart Roffman is president; and the Debtor's sole limited partner is Stuart Roffman. (Modified First Amended Disclosure Statement, p. 10) The Debtor responds that Mr. Roffman will retain his interest in exchange for a fresh capital contribution of $120,000, which he may do under the "new value" exception (or corollary) to the absolute priority rule.

■ This Court rules that the unsecured creditors would not receive value, as of the effective date of the plan, equal to the allowed amounts of their claims. The proposed interest rate on their claims—five percent per annum—is lower than the prevailing rate on Treasury obligations, 5.6 percent, which I take to be equal to the time-value of money, and provides no compensation whatsoever for risk. Therefore,

the partners may not retain their prepetition interests in the partnership.

However, this Court agrees with the holding of In re Bjolmes Realty Trust, 134 B.R. 1000, 1006 (Bankr.D.Mass.1991), that an equity interest holder may receive a new interest in the debtor in exchange for a fresh capital contribution. The absolute priority rule does not prevent the partners from receiving interests in the Debtor in exchange for fresh capital contributions.

Sun Life argues that even if the "new value" rule remains intact, the partners may not receive equity interests in the Debtor because their proposed joint contribution (1) is only a "deposit" and not a contribution of money or money's worth; (2) is not a substantial contribution; and (3) is far less than the value of the interest he would receive in the Debtor. The Court finds that under the plan, it is clear that what the partners are required to contribute is not merely a deposit or a loan, but an equity investment. The amount, however, is left largely to the partners' own discretion. They must contribute $20,000 on the effective date of the plan. Beyond that, they are required to contribute up to $100,000 more, but only when and if the Debtor, whom they will control, determines that additional investment is required. The Court finds these latter contributions to be so discretionary as to have no definite value. I therefore conclude that under the plan, the partners would be receiving all the equity in the Debtor in exchange for a contribution of only $20,000.

■ Sun Life contends that this amount is insubstantial and far less than the value of the equity the partners would acquire. This Court holds, again in accord with Bjolmes, 134 B.R. at 1010–1012, that where a creditor challenges the adequacy of a proposed equity contribution and the Debtor's shares are not publicly traded, "the only way to measure the proposed contribution against market value is to offer the stock for sale." Id. at 1010. As in Bjolmes, the Court will therefore require as a condition of confirmation that the Debtor circulate to all creditors a notice of sale to the partners of all the equity inter-

est in the Debtor, with provision for counteroffers and, if any are filed, for an auction by the submission of sealed bids.[8] Also as in *Bjolmes*, the Court will require that the winning bidder cause the Debtor to consummate the plan of reorganization. The Court will not confirm the present plan of reorganization unless the Debtor follows this procedure.

## ORDER

For the reasons set forth above, the Court orders the Debtor, as a condition of confirmation, to file and serve on all creditors a notice of sale, as required above, by March 16, 1993, at 4:00 p.m. If the Debtor does not do so, Sun Life's objection to confirmation of the plan will be sustained. If a notice of sale is filed timely, the Court will confirm the plan on April 16, 1993, if no counteroffers or objections are filed by the deadline for filing such; if objections and counteroffers are filed, the Court will confirm the plan upon completion of the sale hearing.

---

8. The notice of sale procedure is entirely appropriate. Under the plan, the partners would be receiving equity interests not on account of their prepetition status as equity interest holders but on account of new contributions. In exchange for the contributions, the Debtor would be giving them one of its assets, the right to its future profits. The Court sees no reason why the sale of this asset should not be conducted according to the rules governing the sale of other assets outside of the ordinary course of business.