**In re RIVERS END APARTMENTS, LTD., Debtor.**

**Bankruptcy No. 2–90–03337.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

May 4, 1994.

472

Kenneth R. Cookson, Carlile Patchen & Murphy, Columbus, OH, Carol G. Stebbins, Cardinal Realty Services, Inc., Reynoldsburg, OH, for debtor.

Janice M. Bernard, Squire, Sanders & Dempsey, Columbus, OH, for Peoples Southwest Real Estate Ltd. Partnership.

*OPINION AND ORDER ON OBJECTION TO CONFIRMATION OF CHAPTER 11 PLAN*

BARBARA J. SELLERS, Bankruptcy Judge.

Before the Court is an objection to the requested confirmation of a Substitute Plan of Reorganization, Replacement Modification and Second Modification to the Substitute Plan (collectively "Plan"), as collected and restated on April 18, 1994, proposed jointly by chapter 11 debtor Rivers End Apartments, Ltd. ("Rivers End") and Cardinal Realty Services, Inc. ("Cardinal"). Rivers End is a Florida limited partnership of which Cardinal is the managing general partner. Peoples Southwest Real Estate Limited Partnership ("Peoples") objected to confirmation and voted to reject the Plan. Rivers End therefore seeks confirmation under 11 U.S.C. § 1129(b). The Court heard that matter and considered posthearing briefs and motions filed by the parties.

The Court has jurisdiction in this contested matter under 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L) which this bankruptcy judge may hear and determine.

## FACTS

### The Relationship Between Rivers End and Peoples.

Rivers End owns real property in Jacksonville, Florida, on which a 66–unit single-story apartment complex has been constructed ("Property"). In May, 1985, Rivers End executed a promissory note payable to Cardinal Industries Mortgage Company ("CIMC") in the principal amount of $1,325,000.00. Recourse under that note is limited to the Property. Repayment of the note is secured by a mortgage against the Property, an assignment of rents, and a security interest in all personalty. In May 1985, CIMC assigned the note, mortgage, assignment of rents and security agreement to Royal Palm Savings Association ("Royal Palm"). Royal Palm subsequently was placed under the conservatorship of the Resolution Trust Corporation ("RTC") which subsequently sold the note, mortgage, assignment of rents and security agreement to Peoples.

On May 15, 1990, Rivers End filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code. Rivers End and RTC agreed to use of the rents to pay the reasonable, necessary and ordinary expenses associated with the operation of the Property. After payment of enumerated expenses, net rents were to be paid to RTC to the extent of the monthly payment called for by the note. The agreed order authorizing the use of this cash collateral terminated when RTC sold the note to Peoples. · The parties represent, however, that pursuant to an oral agreement, Rivers End and Peoples continued to operate under the provisions of the original cash collateral arrangement.

### Plan Provisions.

The Plan proposed by Rivers End contains eleven (11) classes of claims and interests. Peoples' allowed claim is bifurcated into a secured claim and an unsecured claim pursuant to 11 U.S.C. § 506(a). It is uncontested that Peoples' total claim exceeds the value of the Property.

The Plan proposes to pay Peoples' allowed secured claim on a 30–year amortization schedule with a discount factor of 8.4% per annum. Peoples disputes the method by which Rivers End calculates the value of Peoples' secured claim and the discount factor proposed.

The Plan further provides that Peoples' allowed unsecured claim will be paid in full with a discount factor of 4% per annum. Interest only is to be paid each year on December 31st if cash flow permits such payment. A final payment of unpaid principal and any accrued and deferred interest is to be paid on account of this unsecured claim upon "plan termination", as defined in the Plan. Payments on account of Peoples' allowed unsecured claim will coincide with payments to be made on the allowed unsecured claims of certain Cardinal affiliates. The allowed unsecured claims of those Cardinal affiliates are also to receive a discount factor of 4% per annum. Payments either to Peoples or to the Cardinal affiliate unsecured claims prior to any sale of the Property or refinancing of the note are to be made only for interest and only to the extent cash flow permits after operating expenses are paid and other payments under the Plan have been satisfied.

Two other classes of allowed unsecured claims, consisting of tenants with security deposits and general unsecured claims less than $3,000, receive full payment within approximately six months of the final order of confirmation.[1]

The Plan also contains three classes of interest holders: (1) the allowed interest of Cardinal as managing general partner; (2) the allowed interests of the limited partners;

1. The Plan provides that holders of general unsecured claims exceeding $3,000 can elect to reduce their claims to $3,000 and be paid 100% of that $3,000 within six months of the final order of confirmation. If no election is made, such claims will receive the same treatment as is proposed for Peoples' unsecured claim. There were no eligible holders in this case.

and (3) the allowed interest of the holder of the participation interest.[2] Cardinal also proposes to seek an administrative expense in the amount of $30,000. The managing general partner interest is to be conferred upon Cardinal "in satisfaction and payment of $3,462 in cash," unless the Court determines that a greater amount is necessary. To the extent Cardinal's administrative expense exceeds the amount paid for its new general partner interest, the remaining administrative expense is to be paid when cash flow permits.

Limited partners were given an opportunity to contribute $1,000 in new monies to purchase one limited partner unit in the reorganized debtor. For each $1,000 contributed, a Class A partner unit will be issued by Rivers End. Cardinal Industries Development Corporation is to acquire any existing limited partner units not so subscribed by converting part of its unsecured affiliate claim to equity at the rate of $1,000 of its claim for each unit so subscribed.

### DISCUSSION AND CONCLUSIONS OF LAW UNDER 11 U.S.C. § 1129(a)

■ A chapter 11 plan proponent must show that all elements of 11 U.S.C. § 1129(a) have been met. Even without objections, the Court has an independent obligation to determine whether all tests necessary for confirmation have been met. 11 U.S.C. § 1129; *In re Future Energy Corporation,* 83 B.R. 470, 481 (Bankr.S.D. Ohio 1988).

### I. UNCONTESTED, SATISFIED OR INAPPLICABLE ELEMENTS OF 11 U.S.C. § 1129(a).

Peoples' objections to the Plan are specific and do not challenge every element of 11 U.S.C. § 1129(a). Subsections 1129(a)(6) and (a)(13) do not apply to Rivers End. Plan provisions relating to the approval of costs and expenses in connection with the case, the treatment of allowed priority claims and the identity of retained insiders satisfy the requirements of § 1129(a)(4), (5) and (9).

Additionally, Peoples does not dispute that § 1129(a)(7) has been met. That section pro-tects each non-accepting, impaired claimant from receiving less under a plan of reorganization than it would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. The Plan proposes payment to each holder of an allowed unsecured claim. The majority of those claims will be paid in full within six months of a final order of confirmation. Peoples' unsecured claim and the unsecured claims of certain insiders are to be paid 100% of the face value of those claims at plan termination. Although the precise delineation between Peoples' allowed secured and unsecured claim is disputed, the parties agree that Peoples' total allowed claim exceeds the value of the Property. Consequently, were Rivers End's assets to be liquidated under chapter 7, general unsecured creditors and interest holders would not receive any payments on account of their claims or interests from assets owned by Rivers End. Additionally, under a chapter 7 liquidation, Peoples would not have an allowed unsecured claim because its recourse is limited to the Property. Thus, any analysis of the financial status of Rivers End's general partner is legally irrelevant to Peoples. Under these facts, the Court finds that the Plan satisfies § 1129(a)(7).

### II. CONTESTED ELEMENTS OF 11 U.S.C. § 1129(a).

#### A. Good Faith.

■ In its original objection and at the confirmation hearing, Peoples contended that the Plan was not proposed in good faith. *See* 11 U.S.C. § 1129(a)(3). Peoples argues that a portion of the Cardinal unsecured affiliate claims represents equity rather than debt and that Rivers End should have brought an adversary proceeding to equitably subordinate at least a portion of Cardinal's claims.

■ Good faith is determined based on the "totality of circumstances" and in light of the Bankruptcy Code's purpose to provide debtors with a fresh start. *B.M. Brite v. Sun Country Development, Inc. (In re Sun Country Development, Inc.),* 764 F.2d 406, 408 (5th Cir.1985). *See, also, Metro Employees Credit Union v. Okoreeh–Baah, (In re*

---

**2.** The participation interest relates to a second mortgage note held by Cardinal Industries of Florida Services Corporation and is being eliminated under the Plan.

*Okoreeh–Baah),* 836 F.2d 1030 (6th Cir.1988). A plan is proposed in good faith if its result is "consistent with the objectives and purposes of the Code", *Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.),* 84 B.R. 167, 172 (9th Cir. BAP 1988).

Peoples presented no evidence to show that this Plan was not intended as an attempt by Rivers End to reorganize. At the conclusion of Peoples' case, Rivers End asked that the good faith objection be dismissed and the Court sustained that motion. Peoples has not raised additional arguments on this issue in its post-hearing brief. Therefore, Peoples' objection that the Plan is not proposed in good faith is dismissed and the Court finds that the Plan satisfies § 1129(a)(3).

### B. *Feasibility.*

 To establish feasibility under § 1129(a)(11), a proponent must demonstrate that its plan offers "a reasonable prospect of success" and is workable. *In re E.I. Parks No. 1., Limited Partnership,* 122 B.R. 549, 558 (Bankr.W.D.Ark.1990). Specifically, a plan proponent must show that its projections of future earnings and expenses are derived from realistic and reasonable assumptions and that it has the ability to make the proposed payments. Without serious dispute from Peoples, Rivers End has established the feasibility of its Plan.

David E. Williams, Vice–President of Cardinal, testified regarding the Plan's projections and assumptions. From his testimony, it is clear that Mr. Williams has spent much time reviewing and analyzing the economic projections which drive the Plan economics for Rivers End (Tr. I–53–58). He compared historic operations with industry guidelines established by the Institute of Real Estate Management and concluded that Rivers End generally outperformed the industry with respect to net operating income (Tr. I–59–60).

The methodology for deriving the Property's future economic projections assumes a growth in income and expenses each year. (Tr. I64–73). Mr. Williams concluded that this anticipated growth is "reasonable and achievable." (Tr. I–73). To support this conclusion, Mr. Williams testified about the anticipated growth in the Jacksonville area generally (Tr. I–70).

The economic projections offered were not seriously challenged, although Peoples challenged the appropriateness of fees charged by Cardinal Apartment Management Group, as the manager of the Property. The Court fails to see, however, how such challenge, even if successful, would negatively impact feasibility.

Peoples proffered testimony to show that if certain assumptions underlying the Plan economics are changed by legal rulings of the Court, the Plan would no longer be feasible. Because the Debtor is not proposing an alternative plan, however, the correctness of such assertions is irrelevant to confirmation of the Plan as currently proposed.

In short, Peoples' evidence failed to contradict Mr. William's conclusions regarding the economic projections for Rivers End. Based upon the evidence, the Court finds those projections realistic and reasonable. Thus, Rivers End has established the first prong of the feasibility test.

Robert E. Pausch, also a Vice–President for Cardinal, testified regarding the ability of Rivers End to make the proposed payments under the Plan (Tr. I–177). Generally, his testimony established that Rivers End will be adequately capitalized as the plan is proposed and that the Plan is structured in a manner to support all liabilities of the partnership (Tr. I–177–180). Mr. Pausch acknowledged that the Plan contained a "couple of lean periods", but felt that Rivers End could perform under the Plan (Tr. I–178). He also discussed in detail the payments to be made under the Plan and adequately demonstrated that, based on the economic projections supported by Mr. Williams' testimony, Rivers End could produce sufficient cash flow to meet those payments. (Tr. I–182 and CRSI and Debtor's exhibit # 13).

The Court finds from the evidence that the Plan is based upon reasonable and realistic projections and offers a reasonable likelihood of success. The Court notes that Peoples does not dispute these conclusions in its post-hearing brief. Accordingly, the Court finds

the Plan to be feasible under 11 U.S.C. § 1129(a)(11).

### C. *Classification of Peoples' Unsecured Claim.*

█ Peoples contends that the Plan impermissibly classifies Peoples' unsecured claim separately from other similar unsecured claims. The Plan provides for an administrative convenience class for general unsecured claimants, a class for claims related to security deposits held by present and former tenants of the Property, a class of unsecured claims held by Cardinal affiliates, and a separate class for the nonrecourse deficiency claim of Peoples. Peoples asserts that this classification scheme runs afoul of 11 U.S.C. § 1122 and thus, the Plan cannot be confirmed. See 11 U.S.C. § 1129(a)(1). It is not entirely clear in which unsecured class of claims Peoples believes its nonrecourse deficiency claim belongs. From the arguments made, however, Peoples appears to contend that all non-insider unsecured claims should be classified together.

The so-called "classification" issue relating to the nonrecourse deficiency claim of a secured creditor which results from 11 U.S.C. § 1111(b) continues to receive much attention. *See, generally,* Carlson, *The Classification Veto in Single–Asset Cases Under Bankruptcy Code Section 1129(a)(10)*, 44 S.C.L.Rev. 565 (Summer 1993). The view that permits a plan to classify separately a secured creditor's nonrecourse deficiency claim adopts a flexible standard of classification based upon "differences in legal priority" of the claims or "practical differences" ascribed to such unsecured claims. 44 S.C.L.Rev. at 576. At least one circuit court mandated such separate classification. *In re Woodbrook Associates,* 19 F.3d 312 (7th Cir. 1994). *See also, In re D & W Realty Corporation,* 156 B.R. 140 (Bankr.S.D.N.Y.1993) *rev'd,* 165 B.R. 127 (S.D.N.Y.1994).

The other approach to this issue views such separate classification as "gerrymandering" of classes to affect vote count and to obtain the acceptance of at least one class of impaired claims as required by 11 U.S.C. § 1129(a)(10). The case law adopting this position generally finds no rational basis for separate classification and, thus, does not permit it. *See Phoenix Mutual Life Insurance Company v. Greystone III Joint Venture (Matter of Greystone III Joint Venture),* 948 F.2d 134 (5th Cir.1991), as amended on Petition for Rehearing, 995 F.2d 1274 (5th Cir.1991); and *Travelers Insurance Company v. Bryson Properties, XVIII (In re Bryson Properties, XVIII),* 961 F.2d 496, 502 (4th Cir.1992).

This Court has yet to address this issue in the context of a chapter 11 plan.[3] The analysis begins with a reading of the applicable statute and the controlling law of this Circuit.

Section 1122 provides:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

The Court of Appeals for the Sixth Circuit has considered this provision and specifically concluded that it "only addresses the problem of dissimilar claims being included in the same class. It does not address the correlative problem ... of similar claims being put in different classes." *Teamsters National Freight Industry Negotiating Committee v. U.S. Truck Company, Inc. (In re U.S. Truck),* 800 F.2d 581, 585 (6th Cir.1986). To prevent abuse of this broad discretion, however, there are limits to the power to classify separately similar claims. *U.S. Truck,* 800 F.2d at 586.

---

**3.** The Court has addressed the issue in the context of a chapter 13 plan. *In re Riggel,* 142 B.R. 199 (Bankr.S.D.Ohio 1992). There are inherent differences between chapter 11 and chapter 13, including the disenfranchisement of unsecured claimants in chapter 13. Therefore, § 1122, as incorporated into § 1129(a), is somewhat different from § 1322(b), as incorporated into § 1325(a)(1). Section 1322(b) presumes a cram down and incorporates the unfair discrimination element into the classification statute.

478

The *U.S. Truck* court found that with § 1122 Congress had adopted less restrictive language than in the predecessor statutes and, therefore, "no longer intended to impose the now-omitted requirement that similar claims be classified together."[4] *U.S. Truck*, 800 F.2d at 585. The court recognized an inconsistency with the legislative history, but concluded that case law under the prior law provided some guidance. A "common theme" in this prior case law gave lower courts "broad discretion to determine proper classification according to the factual circumstances of each individual case." *U.S. Truck*, 800 F.2d at 586. Each proposed classification, therefore, should be viewed primarily against the facts of that case.

Under the facts presented to the court in *U.S. Truck*, substantial differences existed between the segregated claimholder and other impaired unsecured claimants. Those differences justified the separate classification and gave the segregated claimholder "a different stake in the future viability of the reorganized company" and alternative means to protect its claim. *U.S. Truck*, 800 F.2d at 587. Without such flexibility in classification, a claimholder with distinctive interests "could prevent a court from considering confirmation." *U.S. Truck*, 800 F.2d at 587.

The *U.S. Truck* court also recognized that permitting such separate classification did not automatically compel confirmation of the plan. A segregated claimholder which rejects the plan is protected by the "unfair discrimination" and other requirements of 11 U.S.C. § 1129(b). 800 F.2d at 587. *See, also, In re Aztec Company*, 107 B.R. 585, 587 (Bankr.M.D.Tenn.1989); and *In re Creekside Landing, Ltd.*, 140 B.R. 713, 715 (Bankr. M.D.Tenn.1992).

The categorization of arguments about classification, artificial impairment and unfair discrimination is a difficult and somewhat circular process. Section § 1122 neither bans nor expressly permits separate classification of similar claims. *U.S. Truck*, 800 F.2d 581. Likewise, the requirement of § 1129(a)(10) that at least one impaired class accept the plan does not explicitly grant a

veto right to any claimant or interest holder, no matter how significant its role. Nor does that requirement prohibit separation of classes to achieve the one required impaired class vote. Any discrimination alleged to be unfair is more appropriately considered under the cram down tests in § 1129(b). That analysis, therefore, is the more appropriate place to determine whether the distinct treatment proposed for Peoples' unsecured claim fairly relates to legal or factual differences in the nature of its position.

The decisions which prohibit separate classification place undue emphasis on perceived effects such classification may have on the voting process. Contrary to Peoples' assertions, separate classification of a nonrecourse deficiency claim does not disenfranchise or render meaningless the holder's vote. Indeed, if the holder rejects the plan as Peoples has, such rejection forces compliance with the more stringent requirements of 11 U.S.C. §§ 1129(a)(8) and (b). Giving such effect to a negative vote is not "meaningless".

Further, as one court has recognized, "the use of the term gerrymandering is not without its difficulties. Does the right to vote on a chapter 11 plan mean the right to control the process?" *D & W Realty*, 156 B.R. at 143. This Court agrees with the *D & W Realty* court that such control may not be appropriate. Rather, the right to vote enables a dissatisfied claimholder to force the plan proponent to meet the requirements under 11 U.S.C. § 1129(b) when all other elements of § 1129(a) have been met. If the right to vote is found to effectively include the right to veto a plan, it is other accepting unsecured claimholders who are, as a practical matter, disenfranchised. Their vote becomes meaningless because of the overwhelming nature of the nonrecourse claim.

Policy reasons also support the conclusion that general trade claims, security deposit holders and a nonrecourse deficiency claim may be classified separately. Good faith negotiations, which are an integral part of chapter 11, may be encouraged by such clas-

4. See Bankruptcy Act of 1898 § 597 (Chapter X) and § 751 (Chapter XI). Both provisions were repealed by the enactment of The Bankruptcy Reform Act of 1978.

sification. With separate classification permitted:

> Negotiation is most likely to occur in a situation where there is uncertainty. In the typical single-asset case, the dominant creditor can always force the debtor to proceed to cram down. The debtor cannot be assured that it will meet the requirements of cram down. This encourages the debtor to negotiate over such items as interest rates, amortization schedules, balloon payments, and additional collateral. The secured creditor, on the other hand, cannot be assured that it will be able to prevent cram down. This encourages the secured creditor to negotiate in good faith. A veto, on the other hand, will certainly discourage negotiations. Negotiations entail risk. As discussed previously, most secured creditors are institutions. The persons involved in the negotiations do not have a direct stake except as it affects their careers. Therefore, they will be inclined to avoid negotiations to avoid risk to themselves. If a creditor is given an automatic veto, the temptation to "just say no" and forego negotiations will be overwhelming. This will occur even in cases where a beneficial settlement could have been negotiated for both parties.

Sather and Overstreet, 2 J.Bankr.L. & Proc. at 370.

█ Under the controlling principles of *U.S. Truck,* cases interpreting that decision, and this Court's reading of the language and intent of § 1122, Peoples' nonrecourse deficiency claim may be classified separately from other unsecured claims under the Plan. Either a broad or a literal reading of § 1122 makes such separate classification permissible. That finding is only a threshold issue, however, and the proponent still must show that the Plan is fair and equitable and does not unfairly discriminate as to Peoples' claim. *Aztec,* 107 B.R. at 587. The classification, however, does not violate § 1122 and, therefore, does not cause the Plan to fail the confirmation test imposed by 11 U.S.C. § 1129(a)(1).

As a corollary to the above argument, Peoples contends that Rivers End's use of a "convenience class" is improper under the facts of this case. The Court agrees that such categorization of those claims as a "convenience class" is problematic. The Court's ruling on classification is not dependent upon any analysis of the trade creditor class as an "administrative convenience" class, however, and such argument, therefore, need not be addressed as part of the classification issue. As a practical matter, the "convenience class" is the trade debt class in this case. Whether payment of such class prior to payment of Peoples' deficiency claim or later than the effective date is either unfair discrimination under the "cram down" provisions or artificial impairment for purposes of § 1129(a)(10) raises separate issues.

### D. *Artificial Impairment.*

█ Peoples also argues that payment of trade claims and security deposit holders has been delayed for six (6) months after the effective date solely to obtain an accepting impaired class under § 1129(a)(10). The reasons elicited for the delay included the need to "build up" cash early in the post-confirmation period to adequately capitalize the partnership. (Tr. II–29). The explanation satisfied the Court that the delay in payment to these claimants is not proposed solely to achieve impairment. Peoples presented no colorable evidence to refute that testimony. Without Peoples' consent to the use of its cash collateral, the debtor's available funds are severely limited.

Accordingly, the Court finds that at least one class of impaired non-insider claimants has accepted the Plan and the requirement imposed by § 1129(a)(10) has been met.

### DISCUSSION AND CONCLUSIONS OF LAW UNDER 11 U.S.C. § 1129(b) ("CRAM DOWN")

The Court has determined that all applicable elements of § 1129(a) have been met except the requirement in § 1129(a)(8) that all impaired classes accept the plan. The Court, nevertheless, may confirm a chapter 11 plan over the objection of a dissenting class if that plan meets the requirements of 11 U.S.C. § 1129(b). Because Peoples' votes caused rejection in two impaired classes, Riv-

ers End requests confirmation of its Plan under the "cram down" provisions.

This Court recently has analyzed these provisions in *In re Montgomery Court Apartments of Ingham County Michigan, Ltd.*, 141 B.R. 324 (Bankr.S.D.Ohio 1992). Many of the legal issues raised here are similar to those raised in *Montgomery Court.* Peoples, however, has asked this Court to reconsider some of its conclusions in *Montgomery Court* as those apply to the facts of this case. Because of the similarities between the cases, the Court believes *Montgomery Court* provides an analytical framework for the cram down discussion in Rivers End.

Confirmation under the cram down provisions of chapter 11 requires the plan proponent to establish that "the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted the plan." 11 U.S.C. § 1129(b)(1). Specific requirements of "fair and equitable" vary depending upon whether cram down is sought against classes of secured claims, unsecured claims or interest holders. Because Peoples has both a secured and unsecured claim, the Court must consider § 1129(b)(2)(A) and (B).

## I. THE STATUTORY MANDATE FOR A DISSENTING SECURED CLASS.

With respect to Peoples' secured claim Rivers End has chosen to proceed under 11 U.S.C. § 1129(b)(2)(A)(i) which provides:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

Peoples has not made an election under 11 U.S.C. § 1111(b) and, therefore, the Plan must provide for Peoples to receive at least the present value of its allowed secured claim.

### A. The Secured Claim

The dispute about the amount of Peoples' secured claim centers on the extent of the value of the Property to which Peoples' interest attaches.

#### 1. Value of the Property

This Court previously has held that the most appropriate method for valuing income-producing property is the income capitalization method. *Montgomery Court,* 141 B.R. at 338. This approach first determines a net operating income ("NOI") for the Property and capitalizes that NOI at a rate of return believed to be sufficient to attract investors in the Property.

Peoples does not dispute either the methodology or the resulting value asserted by Rivers End for the Property. Mr. Pausch provided the testimony regarding the appropriate NOI and capitalization rate to be used here. (Tr. I–168 and CRSI and debtor's exhibit 9). An appraiser for the debtor suggested a range of capitalization rates appropriate for Rivers End (Tr. I–96), and the rate chosen by Mr. Pausch fell within this range. The Court finds that the capitalization rate and corresponding value of the Property specified by Mr. Pausch is appropriate under the facts of this case. Thus, the Court finds the value of the Property to be approximately $1,115,268.

#### 2. The Extent of Peoples' Interest

The Court next must determine the extent of Peoples' interest in the Property. See 11 U.S.C. §§ 506(a) and 1129(b)(2)(A)(i)(II). That issue involves the propriety of the Plan's proposed deduction for hypothetical liquidation or transfer expenses and the impact of the postpetition net

rents. Peoples opposes the deduction for liquidation or transfer expenses.

In a reorganization proceeding, a deduction from collateral value for hypothetical liquidation or transfer costs is appropriate because the measure of the allowed secured claim is not the value of the property, but the value of the "creditor's interest in the estate's interest in such property." 11 U.S.C. § 506(a). *See Montgomery Court*, 141 B.R. at 338, adopting the reasoning of *In re Weber*, 140 B.R. 707 (Bankr.S.D.Ohio 1992). Peoples acknowledges these decisions, but urges this Court to reconsider them based on recent decisions by courts which hold otherwise.

These decisions generally rely upon language in § 506(a) which states that "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." *See Lomas Mortgage USA v. Wiese*, 980 F.2d 1279, 1285 (9th Cir.1992), *vacated*, ⸺ U.S. ⸺, 113 S.Ct. 2925, 124 L.Ed.2d 676 (1993). Thus, if a debtor intends to retain the property under the plan, no hypothetical costs should be deducted to determine the allowed secured claim. *Brown and Co. Sec. Corp. v. Balbus (In re Balbus)*, 933 F.2d 246, 251 (4th Cir. 1991).

In *Weber*, this Court recognized the differing interpretations arising from the language of 11 U.S.C. § 506(a). 140 B.R. at 710. Determination of an allowed secured claim examines the "creditor's interest", not the value of the collateral. The value of the collateral is only the starting point. To reconcile the seeming conflict within § 506(a) the Court reasoned:

The language in sentence two of § 506(a) does not change this reality. Although the value of the collateral and, correspondingly, the amount of the creditor's allowed secured claim may vary according to the intended use of the property or the purpose for which the valuation is made, the nature or relative extent of the creditor's interest in that property does not change. *Weber*, 140 B.R. at 710.

Based upon this reasoning, the "creditor's interest in the estate's interest" in the property must reflect an appropriate deduction for costs of sale or transfer. That deduction reflects a creditor's expectation that realization on its security requires associated costs. In accounting terms, this is recognized as "net realizable value" (Testimony of John Blust, Tr. I–142). Such reduction in value would be taken into account at the time a loan is extended and would cause the lender to limit the amount of its loan to protect its collection rights. Bankruptcy is clearly a collective collection device. Indeed, assessment, marshalling and distribution of value through the preemption of state law collection rights is the purpose of federal bankruptcy law. *See Warren*, "Bankruptcy Policymaking in an Imperfect World," 92 Mich. L.Rev. 336, 343 (1993). This nature of the bankruptcy process does not change merely because the value of the creditor's collection remedy is being paid over time so that the debtor may retain the property for a reorganizing operation.

Peoples does not dispute and did not present testimony to contradict Rivers End's evidence that ten per cent (10%) is an appropriate deduction for costs of sale or transfer. Mr. Pausch testified that he subtracted ten per cent (10%) from the value of the Property for costs of sale or transfer to arrive at the value of Peoples' secured claim (Tr. I–174). The evidence established that under the facts of this case, ten per cent (10%) is within a reasonable range for such deductions. (Tr. I–147 and CRSI and Debtor's exhibit 7).

The final adjustment Rivers End seeks to apply to the value of the Property to determine the extent of Peoples' interest in the Property relates to postpetition rents paid under the cash collateral order. Rivers End seeks to increase the amount of Peoples' allowed secured claim to be paid over time by an amount equal to the rents paid to Peoples and its predecessor since the chapter 11 filing.[5] Rivers End then would credit a portion

5. Certain issues related to these postpetition rent payments are the subject of an adversary proceeding (Adv. Proc. # 2–93–0285). Those issues do not impact on the legal nature of these Plan provisions, however.

of that amount against payments proposed under the Plan for Peoples' allowed secured claim during the first eighteen (18) months of the Plan. The remainder of the postpetition, preconfirmation payments will reduce the principal amount of Peoples' claim.

To Peoples, the most objectionable portion of this proposal is the "credit" element. Indeed, the addition to the allowed secured claim of these payments is a favorable treatment for Peoples. *See Montgomery Court,* 141 B.R. at 339.

In conclusion, the Court finds permissible Rivers End's proposals to subtract ten per cent (10%) from the appraised value of the Property for estimated transfer or sale costs and to add to the appraised value rents passed through to Peoples and its predecessors postpetition. This process will yield the amount of the allowed secured claim which then must be paid over time with an appropriate discount factor.

### B. *Deferred Cash Payments As They Relate to the Rent Application*

■■■ The Plan proposes to use certain of the postpetition rents "passed-through" to Peoples and its predecessor as a credit against the first eighteen months of payments due to Peoples under the Plan on account of its allowed secured claim. The remaining passed-through rents are to be applied to reduce the principal of that claim. Those rents represent heretofore unused cash collateral of Peoples accumulated during the pendency of this chapter 11 case.

Peoples does not contend that the value of its collateral has declined during the pendency of this case. Additionally, it is not disputed that Peoples is an undersecured creditor. Thus, Peoples was not entitled to adequate protection payments during the case. *United Savings Association of Texas v. Timbers of Inwood Forest Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

Peoples contends that Rivers End is obtaining the credits by "borrowing" back the passed-through rents. This concept of "borrowing" implies that Peoples was entitled to adequate protection payments during the pendency of this case. Such, however, is not the case. Because these rents were "passed-through" to Peoples, however, Peoples has had the use and control of those funds during this case.

Stated simply, those passed-through rents should be considered a prepayment of Peoples' secured claim. Rivers End could have held those rents in a separate account to protect Peoples' collateral during the chapter 11 case. Rivers End could then have used those rents to make payments to Peoples under the Plan. The end result is the same. *See Montgomery Court,* 141 B.R. at 341.

Peoples also asserts that use of the cash collateral as payments under the Plan effectively and significantly diminishes the value of its overall collateral postconfirmation. Peoples argues that the proposed application is essentially a dollar-for-dollar reduction of the value of its collateral. Because of the thirty-year amortization of Peoples' secured claim, most payments or credits in the first eighteen months are applied to interest and not to principal. Peoples thus concludes that little of its principal claim will have been reduced, but the value of its collateral will have declined significantly.

The Court agrees with Peoples that this result, if it actually were projected, would raise questions about the treatment of Peoples' secured claim under the cram down provisions in § 1129(b). Peoples' analysis is flawed, however, because it overlooks the continuation of Peoples' security interest in the rents postconfirmation (Plan § 5.02). Even though right to possession of those rents does not vest until a default occurs, Peoples retains an interest in those rents. Further, the Plan proposes an immediate reduction of principal by the application of certain of the previously passed-through rents. Additionally, Peoples looks only at the value of its cash collateral and not at the projected value of the real property.

As discussed previously, valuation of income producing property is appropriately accomplished by capitalizing the NOI at an acceptable rate. Mr. Pausch performed this analysis using Rivers End's projections of NOI and a 10.25% capitalization rate. The Court has accepted the NOI projections of Rivers End as realistic and reasonable with-

out serious contest by Peoples. The only evidence before the Court of projected value of the Property at the time credit for previously passed-through rent payments concludes, shows that the value of the Property will be higher, not lower. (Tr. II–46–48). That increase in value in effect provides substitute collateral.

Because Peoples' conclusions flow from this flawed analysis, its remaining arguments are misplaced. Its further allegations that the Plan unduly shifts the risk of its success to Peoples are better discussed later in the context of whether the Plan generally is fair and equitable. Accordingly, the Court finds that Rivers End's proposed application of the "passed-through" rents is permissible under 11 U.S.C. § 1129(b).

## C. *The Discount Factor to be Applied to the Deferred Cash Payments*

The Plan proposed by Rivers End does not provide for full payment of Peoples' allowed secured claim on the effective date. Thus, the proposed payment stream must be "discounted" to the present value of that claim. 11 U.S.C. § 1129(b)(2)(A)(i)(II). This requirement is mirrored in 11 U.S.C. § 1325(a)(5)(B). The Court of Appeals for the Sixth Circuit has held that this section requires the Bankruptcy Court "to assess interest on the secured claim for the present value of the collateral (if it is not to be paid immediately) in order not to dilute the value of that claim through delay in payment." *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 429 (6th Cir.1982).

Following *Memphis Bank*, this Court held that the discount rate to be applied to a secured claim paid over time in a chapter 11 is a current market rate of interest used for similar loans within the region. *Montgomery Court*, 141 B.R. at 341. *See, also, In re Aztec Company*, 107 B.R. 585, 587 (Bankr. M.D.Tenn.1989).

Through a posthearing motion, Peoples contends the Rivers End's proposed discount factor must be judged "as of the effective date" as required by § 1129(b)(2)(A)(i)(II). Rivers End argues that such a literal reading of the Bankruptcy Code results in too much uncertainty about the Plan's confirmability at the confirmation hearing, when, as here, several months have passed between the confirmation hearing and the ruling on confirmation.

■ The Court finds that the language "as of the effective date" must be viewed from some definite event. Evidence of the discount factor "as of the effective date" has to involve a limited projection because the effective date always will be after the confirmation hearing. The appropriate time for the Court to judge the terms of a proposed plan is at the hearing on confirmation when the evidence is presented. If the evidence at the confirmation hearing establishes an appropriate discount factor as of that time, and there is no reason presented why that factor would not be appropriate for a short period thereafter, subsequent unknown events beyond the control of the parties should not affect the reliability of that evidence. This finding applies regardless of subsequent positive or negative changes in market conditions.

■ The substantive dispute between the parties here focuses on an appropriate "market rate" of interest. Peoples contends that there is no current market for the type of "forced loan" proposed by Rivers End. This argument presumes, however, that there are legal or policy reasons for increasing the discount factor because the debtor is in chapter 11. As reasoned by one court:

The repeated testimony by experts that no market exists for a loan like this plan is not dispositive of the issue presented. Section 1129(b)(2)(A)(i) requires that a creditor receive the present value of its allowed secured claim under the plan. Every stream of future payments with a given set of risk factors has a present value. *Whitman* instructs this court to use market rates to determine present value. That the proposed loan is not similar to loans made in any market does not end the inquiry. Chapter 11 does not implode merely because there is no "market" for loans of the sort that can be forced upon a secured claimholder under § 1129(b). *Whitman* indicates the preferred proof on which to rely. The unavailability of that

proof only suggests that some other proof is necessary.

*Aztec Company,* 107 B.R. at 588.

Peoples presented the expert testimony of Jeffrey Morris. He concluded that the most appropriate market rate of interest for a loan similar to that proposed by Rivers End involves blending two different rates based upon a 100% loan to value ratio (Tr. II–125 and Creditor's exhibit M). The first component of Mr. Morris' market rate begins with the eleven year treasury note ("T–Note") yield. That rate increases for factors such as "grade" of the project, size of the loan and the recourse status of the loan (Tr. II–126–128). Mr. Morris testified that a typical "spread" or increase over the risk-free rate would be two hundred fifty (250) basis points (Tr. II–129). With a loan to Rivers End, he concluded that the spread should be three hundred twenty five (325) basis points (Tr. II–128).

Peoples argues that there is a second component to the market rate of interest which is based upon an "equity" factor and reflects the 100% loan-to-value ratio. Mr. Morris testified that any loan with a loan to value ratio in excess of 65%, such as Rivers End, would essentially be an investment or equity (Tr. II–133). Such an "investment" would require a substantially higher rate of return. By blending these two components, Mr. Morris arrived at his opinion of the market rate required as a discount factor to be applied to Peoples' allowed secured claim.

Mr. Pausch presented the debtor's expert testimony on this issue. He testified that the discount rate proposed by Rivers End was somewhat higher than a market rate of interest under five methods used. One of Mr. Pausch's methods also began with the yield of an eleven year T–Note. Mr. Pausch increases that T–Note yield by approximately 250 basis points to obtain a "market rate of interest."

■ The Court finds that the method suggested by Peoples, blending two rates to reflect a 100% loan to value ratio, is not supported by the Bankruptcy Code. The discount factor is used "in order not to *dilute* the value of that claim through delay in payment." 692 F.2d at 429 (emphasis added). This protection from dilution is one purpose of a present value analysis. "[A] secured creditor is not entitled to a premium in the form of profit on its secured claim." *In re Ropt Limited Partnership,* 152 B.R. 406, 409 (Bankr.D.Mass.1993). Indeed, this is the underpinning of the concept of present value and reflects the fact that dollars received today have greater value than the same dollars received in the future.

The blended rate suggested by Peoples goes beyond protecting the value of its claim from dilution caused by the delay in payment. The first component, based upon the T–Note yield plus certain increases to that yield, is appropriate. The second component, however, reflects imposition of an additional premium because this is a "loan" forced by the Bankruptcy Code. No sound legal or policy argument can be advanced, however, for increasing the discount factor because the debtor is a debtor or because the loan-to-value ratio is established by the Bankruptcy Code. If a plan of reorganization is feasible, qualification of the borrower is established. Indeed, one can argue that this is not a new "loan" at all, but a Bankruptcy Code sanctioned workout of a prior loan after default. New funds are not being advanced without the consent of the claimant. The claimant is entitled to be protected in two dimensions: (1) for the property interest it has because repayment is secured by the debtor's assets, and (2) from dilution of dollar value expected to occur over the proposed repayment term. To the extent such a result raises issues of potential misuse of the Bankruptcy Code solely for "investment advantage", such concerns are more appropriately addressed under the good faith element of § 1129(a)(3). In this case, which is but one part of a very large enterprise bankruptcy for which the need for reorganization cannot seriously be challenged, such concern is not an issue.

Under the facts of this case, the analysis of a discount factor appropriately begins with the current yield of an eleven year T–Note. That spread is then increased to reflect risk of nonpayment and expected decrease in the dollar over time. The resulting range of

rates will yield the "market rate of interest" required in *Whitman,* 692 F.2d at 429. This method has been used previously. *See Ropt,* 152 B.R. at 409; *Aztec,* 107 B.R. at 588 and *Montgomery Court,* 141 B.R. at 342.

Expert testimony placed the spread between 250 and 325 basis points. Mr. Morris opted for 325 basis points based upon his subjective dislike for Cardinal constructed properties, such as the one owned by Rivers End. (Tr. II–173). He testified that factors such as location, age, occupancy level and good management typically would affect the spread. For Cardinal constructed projects, however, he automatically graded them as "class C" with little or no consideration to those factors. (Tr. II–173). The bias exhibited by Mr. Morris against Cardinal constructed projects decreases the Court's assessment of the objectivity of his testimony. Although Mr. Morris conceded that the Property has a good location and "at least average" management (Tr. II–163), these positive factors did not alter his opinion. Additionally, uncontradicted testimony of Mr. Williams indicated that this project was generally outperforming industry standards.

Mr. Morris testified that 250 basis points is a typical spread for non-Cardinal projects. Accordingly, the rate proposed by Rivers End and supported by Mr. Pausch is within the acceptable range. Selecting a discount factor/market rate of interest is not an exact science.

In summary, the Court concludes that the Plan fairly values Peoples' allowed secured claim. Payment of that secured claim over the first eighteen (18) months of the Plan with credits for "passed through" postpetition preconfirmation rents is permissible under § 1129(b)(2)(A). Additionally, Rivers End has proposed an appropriate discount factor given the facts as they existed at the time of the confirmation hearing.

## II. THE STATUTORY MANDATE FOR A DISSENTING UNSECURED CLASS.

■ To "cram down" a plan over the objection of a class of unsecured claims, the proponent of a chapter 11 plan has two options. Section 1129(b)(2)(B) provides:

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

Subsection (ii) is commonly referred to as the absolute priority rule. If the plan proponent chooses to proceed under subsection (i), future payments to the holder of an unsecured claim must equal the present value of that claim as of the effective date. The present value analysis is similar, but not identical, to that required for a secured claim under § 1129(b)(2)(A)(i)(II) and involves a determination of an appropriate discount factor. The nature of the claims under these sections differ, however, and the determination of an appropriate discount factor is unique to each.

The Plan proposes to pay the allowed unsecured claim of Peoples one hundred (100) cents per dollar at four per cent (4%) per annum. Interest only payments are proposed each year to the extent of available cash flow. A final payment consisting of unpaid principal and any accrued and deferred interest will be made upon Plan Termination as defined in the § 5.05 of the Plan. Should there be surplus funds after sale of the Property or refinancing of the note, that discount factor could increase. Peoples contends that the proposed four per cent (4%) does not provide it with the present value of its unsecured claim. For the reasons which follow, the Court finds that four per cent (4%) per annum is an acceptable discount factor under the specific facts of this case.

■ Determination of an appropriate discount factor is fact specific to a given chapter 11 plan. Moreover, the analysis used to determine a discount factor for a secured claim under § 1129(b)(2)(A)(i)(II) is different from that used for an unsecured claim under § 1129(b)(2)(B)(i). *See In re Westwood Plaza Apartments,* 147 B.R. 692, 702 (Bankr.E.D.Tex.1992).

■ Any analysis of a discount factor for present value purposes requires a determination of the risk of nonpayment. Where, as here, a creditor purchases a claim during the pendency of the bankruptcy, presumably some determination regarding risk has already been made by that purchaser. Peoples did not loan Rivers End money, only to have Rivers End file chapter 11. Peoples voluntarily became a player in this chapter 11 case by purchasing the note postpetition. Said differently, regardless of Peoples' total claim, its exposure or risk in this case relates only to the amount it paid for the note. That factor means that Peoples has minimal exposure on its unsecured claim and, consequently, a lower discount rate than that applied to its secured claim is appropriate. The testimony provided by Peoples ignores this factor.

■ Additionally, the Court notes that, except for the operation of 11 U.S.C. § 1111(b), Peoples would not have an unsecured claim against Rivers End because recourse under the note is limited to the Property. Without § 1111(b), there would be no requirement to pay Peoples' to the extent the Property were worth less than the amount of its obligation. These facts should be reflected in the discount factor attributable to Peoples' unsecured claim.

The Court finds that the four per cent (4%) proposed by Rivers End is an appropriate discount rate for Peoples' unsecured claim. The risk to Peoples of nonpayment is minimal because Peoples has little or no exposure on that claim. Additionally, Peoples voluntarily chose to become part of this bankruptcy case. Under these facts, Peoples undertook a risk willingly. The Court will not require a higher discount factor to be applied to Peoples' unsecured deficiency claim for anticipated investment yield. Accordingly, the Court finds that the Plan proposed by Rivers End satisfies 11 U.S.C. § 1129(b)(2)(B)(i).

Because the Court has determined that Peoples' unsecured claim may be "crammed down" under 11 U.S.C. § 1129(b)(2)(B)(i) as proposed, analysis of cram down under § 1129(b)(2)(B)(ii) is not required. A determination still must be made, however, whether the Plan unfairly discriminates against Peoples' secured and unsecured claims and is generally fair and equitable with respect to those claims.

## III. GENERAL FAIR AND EQUITABLE REQUIREMENTS AND UNFAIR DISCRIMINATION.

■ Compliance with the specific codified requirements of fair and equitable contained in 11 U.S.C. § 1129(b) does not end the inquiry. General requirements of "fair and equitable" must also be considered. In *Montgomery Court* this Court listed certain relevant factors to consider in determining whether a plan is generally fair and equitable with respect to each class of impaired dissenting claims or interests. Those factors are as follows:

(1) whether the statutory mandates of § 1129(b)(2)(A) or (B) have been met;

(2) whether for a secured class, the valuation process has been fair;

(3) whether the primary risk of reorganization remains with the equity interests of the reorganized debtor;

(4) whether any secured loan restructure, including default provisions and other covenants, is reasonable when compared to the parties' previous understandings and practices;

(5) whether the length of time until proposed repayment is reasonable;

(6) whether, for an unsecured class, the percentage or formula for proposed payment demonstrates a good faith effort to repay those obligations; and

(7) whether other particular inequities exist, including special prejudice to a dissenting class arising from its particular circumstances.

141 B.R. at 346.

■ The Court finds that the Plan proposed by Rivers End is fair and equitable as to Peoples' secured and unsecured claims. The statutory mandates of § 1129(b)(2) have been met and the valuation process for the Property has been fair. Indeed, Peoples does not dispute the value ascribed by Rivers End to the Property. The default provisions

and remedies of Peoples' under the Plan are similar to those under the note. The proposed length of time for payment of Peoples' secured and unsecured claims is reasonable in this case. There is no negative amortization proposed in this Plan. Peoples is to receive 100% of its unsecured claim over time. This certainly represents a good faith effort by Rivers End to pay that claim. Payment may not come as quickly as Peoples would like, but the proposal satisfies the Bankruptcy Code requirements. No equity holders receive any distributions until Peoples has been fully paid as proposed by the Plan. Peoples does not raise any "other particular inequities" specific to this Plan and the Court finds none.

Peoples contends that the Plan provisions relating to the application of the "passed-through" rents unduly shift the risk of reorganization to Peoples. The Court has already determined that this application proposal is acceptable. The Court acknowledges that all parties in a chapter 11 reorganization bear some risk of the success of that reorganization. It is not clear, however, that the risk to Peoples under the Plan is significantly different from the known risk it assumed when it voluntarily purchased the note from the RTC postpetition. Further, there is no return to any new equity holder prior to payment to Peoples of all amounts proposed by the Plan. All old equity is extinguished. Indeed, if there are monies remaining after returns to new equity, Peoples is to share in that "upside." Therefore, the Plan proposed by Rivers End is fair and equitable with respect to the secured and unsecured claims of Peoples.

▬ Peoples' final arguments relate to an element of unfair discrimination. Section 1129(b) permits confirmation of a plan over the objection of a class of claims or interests only if that plan "does not discriminate unfairly" against that class. By its terms, this section does not prohibit all discrimination, but only "unfair discrimination". Peoples contends that the proposed treatment of its unsecured claim unfairly discriminates

against that claim because other unsecured claims receive a higher distribution by virtue of much earlier payment.

Outside of bankruptcy, repayment of Peoples' debt is limited to recourse against the Property. Further, the debt to Peoples exceeds the value of Peoples' interest in the Property. See, 11 U.S.C. § 506(a). Peoples has not made the election available to it under 11 U.S.C. § 1111(b) to have its total claim treated as secured.[6] Thus, despite the nonrecourse nature of Rivers End's obligation to Peoples, Peoples' total claim will be treated as if Peoples has recourse against the partnership. 11 U.S.C. § 1111(b)(1)(A). Accordingly, Peoples is entitled to an unsecured claim in this chapter 11 case solely by operation of law.

Much of the case law developed in this area discusses the differences between a nonrecourse deficiency claim and other unsecured claims in the context of the separate classification of such claims. The reasons offered by the courts and commentaries for such separate classification more appropriately support differing treatment for such claims without discriminating unfairly against the nonrecourse deficiency claim.

A nonrecourse deficiency claim is unique because such claim exists only by operation of law pursuant to § 1111(b)(1)(A) and is not granted under the terms of the underlying note. Such uniqueness gives the claimant a different interest in the proceeding and may be sufficient to support different treatment than that afforded other unsecured creditors. *See Woodbrook,* 19 F.3d 312; *Aztec,* 107 B.R. at 587; and *In re Bjolmes Realty Trust,* 134 B.R. 1000, 1003 (Bankr.D.Mass.1991). Because most trade creditors will have recourse against the debtor in a chapter 7 case and a creditor with a nonrecourse claim will not, the amount required to be paid on those claims varies if the case is in chapter 7. Sather and Overstreet, *The Single–Asset Real Estate Debtor: A Selective Overview,* 2 Journal of Bankruptcy Law and Practice, 343 at 374 fn. 109 (Sept./Oct.1993). Equally important, a creditor with a nonrecourse defi-

---

**6.** Such election probably would not be to Peoples' benefit in this case because of the relatively small portion of its debt which is unsecured and

the 100% proposed repayment for that unsecured claim.

ciency claim may have "incentive to vote its large deficiency claim to affect the treatment of its *secured* claim by defeating confirmation of any plan." *Aztec,* 107 B.R. at 587. *See, also, Bjolmes,* 134 B.R. at 1003. This voting motivation differs from that of trade creditors who may wish to "continue doing business with the debtor." Sather and Overstreet, 2 J.Bankr.L. & Proc. at 374.

Moreover, practical differences exist between the obligations of trade creditors and a lender with a nonrecourse claim. Trade creditors generally hold claims that arise from short-term debt and, as such, anticipate payment on a short-term basis. A lender with a deficiency claim usually holds long term debt and has no reasonable anticipation of quick payment. Sather and Overstreet, 2 J.Bankr.L. & Proc. at 373.

Likewise, the claims of security deposit holders have specific statutory entitlements to full payment under state law. Ohio Rev. Code § 5321.16. The small amounts of such claims, held by consumer individuals, differ in nature from either trade claimants or the unsecured deficiency claim. The security deposit claimants never agreed to or intended to extend credit to this debtor. Rather, their agreement was only that the debtor could hold certain of their funds to insure performance of their lease obligations. These legal and practical differences between general unsecured claims, security deposit holders, and nonrecourse deficiency claims provide a rational basis for varying treatment, at least under the terms proposed by this chapter 11 Plan, and cannot be labelled as "unfair".

Accordingly, the Court finds that the Plan's proposed treatment of Peoples nonrecourse deficiency claim does not discriminate unfairly against that claim. There are practical and legal differences between Peoples' nonrecourse deficiency claim and the general unsecured claims of trade creditors or security deposit holders. These differences support the later payment proposed for Peoples' nonrecourse deficiency claim under the Plan.

### CONCLUSION

For the reasons set forth, the Court finds that the Plan proposed by Rivers End complies with the requirements of §§ 1129(a) and

(b). Accordingly, Peoples' objection to confirmation is **OVERRULED.** Rivers End may present an order confirming the joint plan of reorganization, as restated on April 18, 1994.

IT IS SO ORDERED.